PATRICK McGOVERN *vs.* ASAHEL W. MITCHELL, COMP-
TROLLER, ET AL.

First Judicial District, Hartford, January Term, 1906.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The Twenty-fourth Amendment to the Constitution of this State,
adopted in 1877, declares that "Neither the General Assembly, nor
any County, City, Borough, Town, or School District, shall have
power to pay or grant any extra compensation to any public officer,
employee, agent, or servant, or increase the compensation of any
public officer or employee, to take effect during the continuance in
office of any person whose salary might be increased thereby, or in-
crease the pay or compensation of any public contractor above the
amount specified in the contract." *Held :* —

1. That the plain import and intent of this amendment was to prevent
for the future the exercise of a power common to each of the cor-
porate bodies named, by virtue of which they had been accustomed
to pay or grant to particular public officers or employees an " extra
compensation," that is, money in addition to, or in excess of, the
salary or compensation established by law or by contract; or, in
other words, that the amendment was designed to prevent the
payment of gratuities, whether in the form of a direct gift or of an
equivalent increase of compensation in addition to that fixed by
statute or contract.

2. That this power of paying or granting " extra compensation," which
the amendment withdrew from each of the public bodies named,
was one which belonged to them in their respective corporate
capacities as incident to the discharge of their administrative func-
tions, and was not the sovereign power of legislation which was
vested by the Constitution exclusively in the General Assembly.

3. That this power of legislation continued unimpaired, except as to
the acts forbidden by the amendment; and therefore a general law
(Public Acts of 1905, Chap. 213) which established a compensation
for public officers for the future, larger than that which had been
established by previous legislation, was not in violation of the
amendment, although it took effect during the term for which they
were appointed.

Argued January 3d—decided March 7th, 1906.

SUIT to restrain the defendants, as State officers, from
paying increased salaries to judges of the Supreme Court of

McGovern *v.* Mitchell.

Errors and of the Superior Court who were in office,* under a previous appointment, at the date of the passage of an Act of the legislature authorizing such increase, brought to and reserved by the Superior Court in Hartford County, *Reed, J.,* upon a demurrer to the complaint. *Superior Court advised to sustain the demurrer and render judgment for the defendants.*

Since the adoption of the Constitution of 1818 the legislature has, from time to time, established by general law a compensation which it deemed adequate to be paid to the judges of the Supreme Court of Errors and of the Superior Court. In 1871 the legislature, by such law, established the salary of these judges at $4,000 a year; and no new establishment of salaries was made until the passage of the legislation in question.

In 1877 an amendment to the Constitution was adopted, which is in the following language: "Neither the General

---

* When this cause was reached for argument, counsel for all parties stated that they had filed a written waiver of any and every disqualification which might exist on the part of any justice of this court, and of any judge of the Superior Court. Thereupon the court retired for consultation, and upon their return to the court-room the Chief Justice read the following memorandum:—

"The Court is reluctant to hear this cause. No final determination of the subject-matter in controversy, however, can be made except by the Supreme Court of Errors. Of its five justices all are directly interested in the result of this action. Of the judges of the Superior Court who might be called in to sit here, all but two are similarly interested. If, therefore, the cause were to be heard before a full Court, a majority of the judges would be interested in the result. If, on the other hand, a special court of three judges of the Superior Court were to be constituted under General Statutes, § 484, to constitute the Supreme Court of Errors *pro hac vice*, it would be necessary in order to fill it up, to designate at least one judge who was so interested, and thus to place upon him the burden now resting upon each of us.

"The question presented to us by this condition of things we regard as one of judicial duty. The statutes of the State have provided for the situation in which the parties find themselves. They authorize judges who are interested in the event of a cause to hear it, on the request and by the consent of both parties, expressed in open court. Such a request and consent have been expressed in this cause. We think that we have no right, under these circumstances, to decline to exercise the jurisdiction which the law has committed to us."

Assembly, nor any County, City, Borough, Town, or School District, shall have power to pay or grant any extra compensation to any public officer, employee, agent, or servant, or increase the compensation of any public officer or employee, to take effect during the continuance in office of any person whose salary might be increased thereby, or increase the pay or compensation of any public contractor above the amount specified in the contract." This provision is known as Article Twenty-Four of Amendments to the Constitution.

Chapter 213 of the public Acts of 1905 is as follows:—

" An Act amending an Act concerning the Salaries of Judicial Officers.

" *Be it enacted by the Senate and House of Representatives in General Assembly convened :*

" Section 1. Section one of chapter 163 of the public acts of 1903 is hereby amended by striking out commencing in the third line thereof the words ' as their respective terms of office shall hereafter begin,' so that said section as amended shall read as follows : The chief justice of the supreme court of errors, each associate justice of said court, and each judge of the superior court shall receive annual salaries as follows : The chief justice of the supreme court of errors, six thousand five hundred dollars ; each associate justice of said court and each judge of the superior court, six thousand dollars.

" Sec. 2. This act shall take effect from its passage.

" State of Connecticut,

" House of Representatives, July 13, 1905.

" Reconsidered and passed by Yeas and Nays : Yeas 124, Nays 46, the objections of the Governor notwithstanding.

" John A. Spafford, *Clerk.*

" State of Connecticut,

" Senate, July 14, 1905.

" Reconsidered and passed by Yeas and Nays : Yeas 15, Nays 9, the objections of the Governor notwithstanding.

" Alfred C. Baldwin, *Clerk.*"

The judges of the Supreme Court of Errors at the time

the Act of 1905 went into effect were the same judges who constituted the court prior to the passage of the Act of 1903, and were all appointed prior to the passage of that Act. The judges of the Superior Court at the time the Act of 1905 went into effect were the same judges constituting that court prior to the passage of the Act of 1903, except that one judge then in office was retired by constitutional limitation in 1904 and a person not before a member of the court then became judge. With this exception, all the judges had been appointed prior to 1903, one of them, however, continuing in office under a reappointment made shortly before the passage of the Act of 1905.

The plaintiff, describing himself as a citizen, taxpayer, and elector of the State, and, in common with his fellow-citizens, entitled to all the protection, benefits, privileges and immunities arising from Article Eleventh of the Constitution relative to amendments to the Constitution, brought this action, alleging the passage of the Act of 1905 and the constitution of the Supreme Court of Errors and of the Superior Court at and before the passage of that Act, and alleging that " the legislature has passed an Act which attempts to increase such salaries, and the State officials threaten to comply with it to the damage of the plaintiff " ; and praying for an injunction restraining the State comptroller and treasurer from drawing and paying orders for the salaries mentioned.

The Attorney-General demurred to the complaint on the following grounds : " (1) Because the Constitutional *Judicial Officers* mentioned in said complaint, to wit,—The Chief Justice of the Supreme Court of Errors, the Associate Judges of that Court, and the Judges of the Superior Court, are not *public officers, employees, agents, or servants* within the true intent and meaning of the twenty-fourth article of the amendment to the Constitution. (2) Because the Senate and House of Representatives as ' the Legislature of the State of Connecticut' in enacting the law referred to in paragraph 3 of the substituted complaint, lawfully exercised ' the Legislative power of this State ' exclusively vested by

the Constitution in the Senate and House of Representatives, and especially so vested therein by Article Third, Section 1, and Article Fourth, Section 12, and did not as ' the General Assembly' referred to in Article Twenty-Four of the Amendment to the Constitution pay or grant anything to, or increase the compensation of any public officer, employee, agent, or servant, within the true intent and meaning of said Twenty-fourth Amendment to the Constitution."

The following stipulation was filed in the Superior Court: " The parties to the above-entitled action hereby stipulate and agree that for the purpose of determining the question of the constitutionality of the Act of the Legislature, passed at the January session of 1905, as set forth in Chapter 213, Public Acts of the State of Connecticut, and entitled,—' An Act Amending an Act Concerning the Salaries of Judicial Officers,' the demurrer to the complaint, as filed by the Attorney-General in behalf of the defendants, shall be considered as presenting, in connection with the plaintiff's complaint and amended complaint, said question for the consideration of the Supreme Court of Errors, January Term, 1906, First Judicial District, and that all formal defects in said complaint and amended complaint and demurrer thereto are hereby waived for the express purpose of presenting to said Supreme Court the question of the constitutionality of said Act."

*John A. Stoughton*, for the plaintiff. At the time of the passage of the Act under consideration the plaintiff was and now is a member of the State Senate, and voted against the passage of the Act.

*First.* The construction of the Constitution must be according to the commonly approved usage of language, by virtue of the statute declaring that in the construction of all statutes of this State words and phrases shall be so construed. General Statutes, § 1. " Public officers " includes the governor and other State officers directly mentioned in the Constitution, and all officers established by or in pursuance of Article Fifth, which defines the judicial department.

All these officers are understood, in the natural interpretation of the language, as " public officers." A judge is a public officer. 23 Amer. & Eng. Ency. of Law (2d Ed.), p. 322; 17 id. p. 716.

*Second.* The Constitution is a limitation of the powers of the General Assembly in all cases covered by its provisions. The question is whether "judges of the court" are such public officers, etc., as to fall within its provisions. Great stress should be laid upon contemporaneous interpretation, and upon general interpretation of language by long-continued practice. Until the adoption of Article Twenty-Four, salaries of judges while continuing in office had been increased, and several Acts passed between 1867 and 1871 had provided that the salaries established in July should commence in the preceding May. This retroactive increase of salaries must have been in the mind of the legislature of 1877 when it passed upon Article Twenty-Four, especially in view of the fact that widespread financial depression then prevailing had attracted public attention to closely scrutinizing public expenditures. Legislative Documents, 1879, Message of Governor. In 1818 the Constitution provided that the compensation of governor, lieutenant-governor, and members of the General Assembly should be established by law, and should not be varied so as to take effect until after an election next succeeding the passage of such law. Until 1877 the Constitution contained no provision as to increasing or diminishing the salaries of judicial officers during their terms of office. Bearing in mind that the judges and sheriffs were the only officers named in the Constitution whose terms extended beyond a year, it is significant that on March 12th, 1877, the legislature passed an Act submitting the proposed Twenty-Fourth Amendment to the people for their approval, and eleven days later passed an Act providing that all compensation paid to "any person holding any office under, or performing any service for, any department of the state government, whether executive, judicial, or legislative, . . . . is hereby reduced ten per cent. from the rates now established by law; . . . . *provided*, nothing

in this act shall affect the salary now by law established for the judges of the supreme and superior courts." The language of the latter Act plainly includes judges save for the exception of the proviso, and was intended to affect every public officer except judges of the two courts named. In using the words "public officer" in the former Act, the legislature must have used it as the equivalent of the language of the latter Act, and intended the constitutional amendment therein proposed should affect every public officer, including judges.

*Third.* The judges of the two constitutional courts are not a peculiar class of persons not contemplated within the general term "public officers." No unusual construction of language is suggested to show that judicial officers as a class are exempted from the inhibition of Article Twenty-Four. The term "public officer" is wider than any member of the class; and the words "any person" include all individuals of a class. The greater expression "public officer" includes all lesser degrees of preferment within its definition.

*Fourth.* The Act of 1905 is an attempt to amend the Constitution without submitting the amendment for ratification. It is manifest that all officers having a specified term fall within the prohibition, under the general term of "public officers." *Wright* v. *Hartford*, 50 Conn. 546. Since the adoption of the amendment the legislature has not attempted to increase the pay of judges in the manner now proposed. It is evident from the Act passed March 12th, 1877, that the legislature then considered judges within the definition of "public officers." In interpreting the Constitution words must be presumed to have been employed in their natural and ordinary meaning. Cooley's Const. Lim. (7th Ed.) p. 92; Report of Attorney-General to Legislature, 1903–4, p. 47. Since the adoption of the amendment not a suggestion has been made, so far as public records and legislative journals disclose, that salaries should be increased to take effect during the continuance in office of any incumbent.

*Fifth.* In all probability the judges of the two constitutional courts were the conspicuous public officers to which' Article Twenty-Four had reference. The instances cited of legislation establishing judicial salaries indicate that this was the evil sought to be remedied in the adoption of Article Twenty-Four.

*Sixth.* Contemporaneous construction and cognate legislation support our claim. Act of March 7th, 1878, repealing Act of March 23d, 1877, in so far as it affects the compensation of certain judges of the Court of Common Pleas; Act passed March 1st, 1881, establishing salary of judge of Court of Common Pleas from the following 1st day of July; Act of April 13th, 1881, establishing the annual salary of all chief justices hereafter appointed. Where the legislature puts a construction on an Act, a subsequent cognate enactment in the same terms would prima facie be understood in the same sense. 6 Amer. & Eng. Ency. of Law (2d Ed.), p. 1035. Again, in 1905, an Act passed on June 16th establishes the salary of the judge of the Court of Common Pleas in Hartford County " as his term of office shall hereafter begin." An Act establishing the salary of the judge of the Court of Common Pleas as his term of office shall hereafter begin, and an Act establishing a salary for all judges of the Superior Court without this qualification, cannot both be constitutional under the question raised by the first ground in defendant's demurrer. The judges of the two courts established by the Constitution, and the judges of such inferior courts as the legislature is authorized from time to time to establish, are all equally " public officers " ; and the constitutional provisions applicable to the former are equally applicable to the latter. This construction of the Constitution is established by the practice of the legislature in passing the Act cited. Construction placed upon constitutional provisions through the enactment of laws and other legislative practice, should not be overturned without weighty considerations. *Moers* v. *Reading*, 21 Pa. St. 188, 201 ; 6 Amer. & Eng. Ency. of Law (2d Ed.), p. 1036 ; *Pochin* v. *Duncombe*, 1 H. & N. Exch. 842, 855, Pollock,

C. B. To contend that Article Twenty-Four does not include judges because not named therein, is as improper as to contend that it does not include any other public officer because not named therein. The power to increase or vary the compensation of public officers lay wholly within the proper exercise of the legislative function prior to the adoption of Article Twenty-Four. But the respect paid to its prohibition since its adoption indicates that the people have considered that they had made a plain and unmistakable withdrawal from the legislature of all the powers it had previously exercised on the subject, and the courts should be governed by the common-sense construction put upon it through legislative enactments up to 1905. Constitutions should not receive a narrow construction, and are to be read in a broad way, to carry out their purpose. *Page* v. *Allen*, 58 Pa. St. 338, 98 Amer. Dec. 272. Section 1365 of the General Statutes, imposing a penalty upon " every officer " of the State who charges and receives any sum in excess of the compensation fixed by law, includes many of the terms of Article Twenty-Four, and judges, as public officers, fall within the language of the amendment as well as of the statute. *Smith* v. *Waterbury*, 54 Conn. 174; *Wright* v. *Hartford*, 50 id. 546 ; *Garvie* v. *Hartford*, 54 id. 440; *Farrell* v. *Bridgeport*, 45 id. 191. The case of the *Commonwealth* v. *Mathues*, 210 Pa. St. 372, 59 Atl. Rep. 961, was decided in view of provisions of the Pennsylvania Constitution not contained in the Constitution of this State.

*Seventh.* Having shown that the Public Acts from 1877 to 1905 have given a continual, practical and common-sense interpretation of Article Twenty-Four, which, under the rule laid down in the provisions of the General Statutes first cited, determines the meaning of the language used, and that this practical construction is supported by the legal construction to be inferred from *Wright* v. *Hartford*, and other cases cited, it follows that judicial officers are public officers, and the language of Article Twenty-Four includes judicial officers within the public officers therein mentioned, and its provisions apply to judicial officers. In conclusion :

Political privileges conferred upon the people are beyond legislative interference, without any express constitutional provision that the people shall not be deprived of them by legislative enactment. *Gemmer* v. *State*, 163 Ind. 150, 71 Northeastern Rep. 478. No legislative Act contrary to the Constitution can be valid. Until the Constitution is changed it must invalidate every inconsistent Act of legislation. See Hamilton in the Federalist, Article on Judiciary. It may be claimed that legislation under plaintiff's contention must work inequality. But public officers entering upon office with full knowledge, thereby accept the situation. An agreement to work for the same pay given to others for less work is binding. Matt. Ch. 20, v. 13, 14. The remedy for such inequality in legislation is by constitutional amendment, and the surprise deepens that no effort has been made to submit such an amendment to the people.

*Henry Stoddard*, and *William A. King*, Attorney-General, for the defendants.

HAMERSLEY, J. In 1818 the people of Connecticut first enacted a "Constitution, and form of civil government" for this State. In the first Article they established certain maxims and limitations of power as fundamental to the exercise of power by each department of government. In Article Second they divided the powers of government into three distinct departments and confided each to a separate magistracy, to wit: the legislative to one, the executive to another, and the judicial to another. In Article Third they established a body politic styled "The General Assembly." This body was composed of two distinct houses or branches, and was empowered, both by express provision and necessary implication, to exercise by joint action of both houses and separate action of each house the powers necessary to the existence of such a body politic and to the transaction of its appropriate business. They vested in the two distinct houses of this body, convened in General Assembly, "the legislative power of this State," and prescribed the forms

and proceedings by which this legislative power should be exercised in the enactment of laws. In Article Fourth they vested "the supreme executive power of the State" in a governor, and established other officers named for the exercise of other executive power, and prescribed the term of office, mode of appointment and essential duties of all these officers. In Article Fifth they established two courts, a Supreme Court of Errors, and a Superior Court. Each court was composed of members or judges who exercised jointly or separately the power of the court. They vested "the judicial power of the State" in these two courts thus composed, and in such inferior courts as the General Assembly might from time to time establish. These five articles contain the simple framework of our Constitution, which is not essentially affected by the remaining articles. Article Sixth relates to the qualifications of electors. Article Seventh severs the connection between church and state which under the charter government to some extent existed. Article Eighth confirms the charter of Yale College and makes perpetual the existing school fund. Article Ninth provides for impeachments and defines treason. Article Tenth provides a form of oath for members of the General Assembly and executive and judicial officers; an annual election of selectmen and members of local police in each town; defines the effect of the Constitution upon existing rights, duties, obligations and officers; and forbids the constitutional executive and judicial officers, members of Congress, and United States officers, to be members of the General Assembly. As the constitutional executive and judicial officers could not be members of the General Assembly, except that the governor should take a part in its legislation and the lieutenant-governor should be presiding officer of the Senate, the duty of the legislature to establish by law a compensation for the constitutional officers of other departments was modified, as to the governor and lieutenant-governor, by the provision in Article Fourth preventing any law establishing compensation for the governor, lieutenant-governor, senators and representatives, from varying the compensations of the persons

who had taken part in its enactment. Article Eleventh provides for amendments to the Constitution.

In the establishment of three distinct departments of government the Constitution, by necessary implication, prescribes those limitations and imposes those duties which are essential to the independence of each and to the performance by each of the powers of which it is made the depositary. *State* v. *Conlon*, 65 Conn. 478, 488. The judges of the Supreme Court of Errors and the judges of the Superior Court, respectively, constitute those courts. The judges of each court in their joint or separate action exercise the power of that court; each, equally with every other, represents in his official action the judicial power of the State vested in the court of which he is a member. In view of the nature and extent of his duties, the Constitution, in imposing them upon him, secures to him by necessary implication an adequate maintenance, and imposes upon the legislative department the duty of establishing by law an adequate compensation. Unless this compensation were adequate, unless it were certain, unless it were uniform for each court, the independence of the judicial department would be necessarily impaired. A court, each of whose members depended for his livelihood, not upon a certain sum fixed by the legislative department in obedience to the Constitution, but upon occasional grants ; not upon a sum fixed for each member in view of the equal services required of all, but upon a sum fixed for him in view of the discriminating value which the legislature for the time being might attach to his services, cannot be the independent judicial department created for the special purpose, among others, of giving an independent judgment as to the validity of the acts of its co-ordinate departments.

A broad grant to one department of the entire power of legislation, limited by the duties imposed upon it to other departments of government, and by the maxims adopted in Article First as fundamental to government; a distinct executive department; and a distinct judicial department, the independence of its members guaranteed by their separate and direct commission from the enacting sovereignty, the

certainty of their tenure of office, and the duty laid upon the
legislative department to provide for their independent
maintenance by legislation, and by legislation alone, a cer-
tain, uniform, and adequate compensation,—these are the
essential features of our Constitution, their clearness un-
clouded and their force unhampered by superfluous language
or weakening detail. All subsequent amendments have
aimed to leave these essential features untouched. Our people
have persistently resisted every temptation to endanger by
unnecessary detail the safe simplicity of these essential
features, or to fetter the freedom of legislative action within
the lines of granted power. The broad grants, limitations
of power, and impositions of duties inherent in the establish-
ment of distinct and co-ordinate departments for the admin-
istration of government, are possibly more effectual as to
each included particular than a detailed specification. *State
v. Conlon*, 65 Conn. 478, 488; *Norwalk St. Ry. Co.'s Appeal*,
69 id. 576, 586–593. Our Constitution, therefore, expresses
as effectually as if framed in precise language, the following
mandates : " The legislature shall have power to enact laws
for regulating the administration of government by public
servants, and for establishing, increasing or decreasing their
compensation as the exigencies of public service may require.
The legislature shall not have power to enact laws encroach-
ing upon functions exclusively vested in the Supreme Court
of Errors and in the Superior Court, or destroying the in-
dependence of the members of these courts, and shall enact
laws establishing from time to time for all members of each
court a certain, uniform, and adequate compensation."

The amount of the compensation to be paid to the judges
of each of these courts was left to be determined by such
laws as the General Assembly might think proper to enact
from time to time. During the previous history of the
Commonwealth, judicial "fees" or "wages" had been fre-
quently varied to correspond with changes in social condi-
tions. At the first establishment of the Superior Court, in
1711, the "fees" of the Chief Justice were ten shillings for
each day of actual attendance at court, and of the associate

judges four shillings. Statutes (Ed. 1715), pp. 36, 168. After the general adoption of a decimal system of currency, annual salaries were substituted for a *per diem* allowance, the Chief Judge of the Superior Court receiving $750, and the associates $667, "in lieu of Day Wages and Expences, except Dining Expences for the Court." Rev. of 1796, p. 177. In 1798 these sums were increased to $1,000 and $900 respectively. Comp. 1808, p. 291, Chap. 2.

There can be no question that the people, in adopting the Constitution of 1818, intended to leave the same powers in this respect in the hands of the General Assembly which it had always possessed and so frequently exercised. But by this Constitution a radical change was made in the terms of judicial office. Theretofore they had been annual. Thereafter they were—in case of those occupying the bench of the Supreme Court of Errors and the Superior Court—to last for the life of the incumbent, or until he reached the age of seventy. This made it forever impossible that all the membership of either court should go out of office at the same time. Any law, therefore, that could be passed increasing or decreasing judicial salaries, whether to take effect presently or at a future date, would either affect some then occupying seats upon the bench, or discriminate in favor of or against them as compared with their associates in office. There is every reason to suppose that no such discrimination could have been contemplated as possible. It therefore follows that the people must have intended that any changes made in the compensation of the judges of the two courts, the perpetual maintenance of which their Constitution required, should enure to the benefit, or to the disadvantage, as the case might be, of all alike.

Several changes of this kind, affecting both the judges of the Supreme Court of Errors and of the Superior Court, were made by law for the equal benefit of all the judges, between 1818 and the adoption of Article Twenty-Four of the Amendments to the Constitution. The first which attempted to discriminate between the different members of either court was enacted in 1903 (Public Acts of 1903,

Chap. 163), and was as follows : " Section 1. The chief justice of the supreme court of errors, each associate justice of said court, and each judge of the superior court, as their respective terms of office shall hereafter begin, shall receive annual salaries as follows : The chief justice of the supreme court of errors, six thousand five hundred dollars ; each associate justice of said court and each judge of the superior court, six thousand dollars. Sec. 2. This act shall take effect from its passage." This was a legal determination of the amount of salary which the legislative department deemed to be adequate for these judicial officers, under the conditions then existing. The increase of salary so given enured to the benefit of each who might be thereafter appointed. One such officer was subsequently appointed at the same session of the General Assembly. Two years later this legislation, if it were regarded as strictly valid, was deemed an inadequate performance of the legislative duty, and by the law the validity of which is called in question by this proceeding, the new rate of salary already obtaining as to judges appointed after June 11th, 1903, was also established for all those upon the bench who had been appointed before that day.

The plaintiff asserts that this legislation is void by reason of the operation of Article Twenty-Four of the Amendments, and has brought this action for the purpose of obtaining from the Supreme Court of Errors an authoritative declaration of the true intent and meaning of Article Twenty-Four. The Attorney-General—being by law the adviser upon questions of law submitted to him by either of the two houses of the General Assembly, by which this law was enacted, and the legal representative of the State officers made defendants, by whom the law must be executed, and charged with general supervision over legal matters in which the State is interested —has joined with the plaintiff in stripping the case of all technical questions for the express purpose of presenting to this court for determination the single constitutional question involved. To this end the stipulations in the Superior Court and in this court were filed, and it was stated in argument that counsel representing both sides had agreed that any fact

or circumstance which the court may consider relevant or material should be treated as a fact in the case.

The plaintiff's proposition is this : Article Twenty-Four expresses the following mandate : " No law shall be passed establishing the compensation of public officers by which any public officer in office when the law takes effect may receive for future services a compensation larger than that received for past services." The Attorney-General affirms that, assuming this mandate to be expressed in the Constitution, it is nevertheless consistent with obedience to that other mandate, necessarily implied in the Constitution, commanding the legislature to establish by law an adequate compensation for all members of each of the constitutional courts ; and the Attorney-General also denies that the mandate quoted by the plaintiff is expressed in Article Twenty-Four. The question before us is, therefore, presented under two aspects.

*First.* It is a rule too well settled and obvious to be questioned, that each provision of a constitution must be construed in view of its relation to the whole instrument. Of two constructions, either of which is warranted by the words used in a constitutional provision, that is to be preferred which best harmonizes the provision with the general terms and spirit of the constitution; and that must be preferred which prevents a fatal clash with some other provision of equal or greater importance ; and so, generic words, whose meaning is broad enough to cover a particular case, must be held not applicable to that case when such application involves a violation of other essential provisions and is not necessary to give effect to the evident purpose of that provision. *Griffin's Case,* 11 Fed. Cas. 7 (No. 5,815), Chase's Decisions, 364 ; *Phillips* v. *Covington & Cincinnati Bridge Co.,* 2 Met. (Ky.) 219, 222; *People ex rel. Kennedy* v. *Gies,* 25 Mich. 83 ; *Douglas* v. *Timme,* 32 Neb. 272, 274 ; *State ex rel. Martin* v. *Kalb,* 50 Wis. 178 ; *Mayor & C. C. of Baltimore* v. *State,* 15 Md. 376 ; *Commonwealth* v. *Mathues,* 210 Pa. St. 372, 422 ; *Brown's Appeal,* 72 Conn. 148, 150. In *People ex rel. Kennedy* v. *Gies,* 25 Mich. 83, a constitutional provision giving exclusive power to fix the compensation for all services rendered a county was held

not to include services rendered to the county by the county auditor.    In *State ex rel. Holmes* v. *Dillon*, 90 Mo. 229, 233, it was held that a constitutional provision giving the Supreme Court exclusive jurisdiction in any case where a State officer is a party, did not apply to a sheriff, although the words "state officer" were broad enough to include that officer.    In *Douglas* v. *Timme*, 32 Neb. 272, the provision that the compensation of a public officer will not be increased or diminished during his term of office was held to exclude public offices not created by the constitution.    And a similar limitation to the broad meaning of the word was applied in *State ex rel. Martin* v. *Kalb*, 50 Wis. 178.    And in *Griffin's Case*, 11 Fed. Cas. 7 (No. 5,815), this rule was applied by Chief Justice Chase sitting as circuit justice, for the purpose of limiting the broad language of the 14th Amendment. In the plaintiff's assumed mandate, the words "public officer" may be synonymous with "officer," and broad enough to include any person authorized to perform any public duty; but "public officer" is a term not used in our Constitution except in Article Twenty-Four, and rarely used in legislation unless limited by its context.    In Article Tenth the generic word "officer" is dealt with in its broadest meaning, and the classes to which it may apply are defined as members of the General Assembly or legislative officers, executive officers, civil officers, judicial officers, and military officers.    It is obvious that "public officer," as used in the plaintiff's assumed mandate, cannot include members of the General Assembly or legislative officers, cannot include the governor or lieutenant-governor; can it include military officers, so that a law rearranging the duties of officers and men of the national guard and adapting their pay to changed conditions or sudden emergencies cannot increase the pay without discharging all who are in service?    While there are reasons entitled to grave consideration for the claim of the Attorney-General that the term "public officer" as thus used does not apply to judges of the Supreme Court of Errors and Superior Court, we do not find it necessary to decide that question.    We pass therefore to a consideration of the

question submitted to us as it is presented under the second aspect.

*Second.* It is an evident purpose of Article Twenty-Four to prevent the payment by any one of the six public bodies named, to any officer, employee, or contractor, of any compensation in addition to that which is established by law or by contract. The compensation of most officers is established by law and not by contract, although in the case of certain officers appointed by a municipality the compensation may be established by contract. *Chase* v. *Lowell,* 7 Gray (Mass.) 33. The compensation of a public contractor is ordinarily established by contract. This evident purpose is expressed in language plain and unmistakable. Does the Article also express in any language a purpose to limit the power of the legislature in the enactment of legislation by which alone the compensation of most officers can be established by law? The legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties. It may also shorten or lengthen the term of service. And it may increase or diminish the salary or change the mode of compensation. And this plenary power is only limited by express terms or necessary implication. *Butler* v. *Pennsylvania,* 10 How. (U. S.) 402; *Newton* v. *Commissioners,* 100 U. S. 548, 559; *Farwell* v. *Rockland,* 62 Me. 296, 300; *Ex parte Lambert,* 52 Ala. 79; *Farrell* v. *Bridgeport,* 45 Conn. 191, 195; *State ex rel. Rylands* v. *Pinkerman,* 63 id. 176, 182; Ordronaux, Const. Leg. 289; Black's Const. Law, § 136; Cooley's Const. Lim. (7th Ed.) 227. The plaintiff's opinion that chapter 213 of the Public Acts of 1905 is unconstitutional, rests wholly upon finding in the language of Article Twenty-Four such a limitation by express terms or necessary implication, and upon the claim that this particular Act is unconstitutional because any law which adjusts or modifies the compensation of any existing officers, executive or judicial, except by way of decrease of compensation, is unconstitutional. That such a sweeping limitation of legislative power cannot be found

in Article Twenty-Four in express terms is certain, and we think an examination of the language of the Article, giving to it its natural and apparent meaning, will render it clear that no implication of this kind is possible.

The Article was framed, and must be read, in view of existing legislative power and of an existing evil calling for some remedy. The power of regulating by law the compensation of public officers is inseparable from one of the broadest and most important fields of legislative power, namely, that of creating the whole machinery of government and providing for its administration. A free hand in adapting the amount and kind of compensation to the varying conditions of public service required is essential to the efficient execution of this power. A limitation, such as that claimed, must raise difficulties serious and in some cases insuperable, especially in view of the modern tendency to commit large fields of public service to official boards and to classes of officers holding office during good behavior or until removed for cause. That some peculiar evil must have suggested this obviously peculiar amendment seems manifest. The fact that for some years prior to 1877 the law then in force providing that certain annual salaries should be paid only half-yearly and on the second Monday of May and November, led the legislature, then holding annual sessions commencing on the first Wednesday in May, in changing by law these salaries, to provide that the increased salary should correspond in date with the current half year then just begun, is suggested by the plaintiff as the moving cause of the adoption of Article Twenty-Four. Such a cause hardly seems appropriate or adequate. The real evil intended to be remedied is plainly indicated in the legislative records. It appears that not only cities and towns, but the General Assembly also, in the transaction of the business committed to them respectively as a body politic, had occasionally paid to particular officers and employees a compensation beyond that established by law, or fixed by the terms of an agreement in cases where the right to compensation could arise by contract. Such payments, not being in pur-

suance of any obligation arising from law or contract, were, legally speaking, gratuities. The custom of giving such gratuities by the General Assembly was in 1865 checked by a public Act which established the salary of officers of the House and Senate at a *per diem* for each day of actual session, and forbade other compensation. Public Acts of 1865, p. 130, Chap. 126. In 1869 an Act was passed establishing salaries for the clerks of the Senate and House, and providing that such salary should not be increased or diminished at the session by which they were elected. Public Acts of 1869, p. 301, Chap. 75. The practice continued of giving by a mere grant or order gratuities, that is, a compensation in addition to that established by law, whereby the salaries were practically increased without legislation. The legislature of 1874 made the legislation more specific by an Act, incorporated in the Revision of 1875, enacted at said session. The Act established the compensation of members of the General Assembly, clerks and assistant clerks, messengers and doorkeepers of the two houses, and provided that " the compensation of such members and officers shall not be increased or diminished by the General Assembly to or by which they shall have been elected." Revision of 1875, p. 174, Chap. 3. In the closing hours of this session of 1874, however, the General Assembly, not by legislation but by mere grant or order of the Senate and of the House, paid gratuities to various officers, employees and others connected with the transaction of its business. These grants were in number forty-seven, and in aggregate amount about $11,000. By these grants extra compensation was paid to various officers and employees, and the compensation of the officers of the two Houses was increased beyond the amount established by law. Journals of the House and Senate for 1874. This is an apt illustration that the same persons acting as a corporate body dealing with public employees connected with them in the transaction of business are not governed by the same restraints that control them when acting as a legislative body. Similar grants were made at the close of the session of 1875. In 1876 the House

of Representatives, in view of the fact that such gratuitous payments were made alike by the General Assembly and other public bodies, proposed an amendment prohibiting the General Assembly, as well as the other bodies politic named, from paying under any form or guise gratuitous compensation to any public officer, employee, or contractor; which in the fall of 1877 was adopted by the people as Article Twenty-Four.

The Article consists of a single sentence framed to express a single purpose, which purpose is declared by the House of 1876, which proposed the amendment, and by the House and Senate of 1877, which approved the proposed amendment, as "relating to extra compensation to public officers"; and in the Act submitting the amendment to the people its purpose is defined as "prohibiting extra compensation to public officers." This purpose is plainly expressed in the first words of the sentence, and these words manifestly dominate the construction and meaning of the whole sentence and control the application of succeeding words: "Neither the General Assembly, nor any County, City, Borough, Town, or School District, shall have power." Whatever limitation upon the exercise of power by any of the public bodies named is imposed by the sentence, is necessarily controlled by these words. The power limited or taken away is an existing power held in common by each of the bodies named, and the prohibition is that this common power shall henceforth be exercised by neither one nor the other of these bodies. The only power common to a school district or a county and the General Assembly is the power inherent in every public body to do those acts necessary to the transaction of its business as a public body. It is equally clear that the sovereign power of enacting laws, of which the General Assembly is made the exclusive depositary, and for which purpose it was made a public body having the administrative and other powers incident to such a public body, is a power held by the General Assembly alone and not in common with counties, towns, and the other public bodies named. Our Constitution specially de-

fines certain powers that may be exercised by the General
Assembly jointly, or through either branch as a public body,
in addition to those necessarily involved in its establishment,
and this is true of all constitutions. Black's Const. Law,
§ 135; Cooley's Const. Lim. (7th Ed.) p. 187; Ordronaux,
Const. Leg. p. 365. Among these powers belonging to the
General Assembly as a public body, is the power of appoint-
ing its officers and paying their compensation, and paying
money from the public treasury by grant or order. These
powers may be exercised without legislation. The Con-
stitution clearly defines the mode in which the power of
legislation shall be exercised, and clearly distinguishes pay-
ment by grant or order of the General Assembly from any
payment depending on authority of legislation. Art. IV,
§§ 12, 17, 19.

Article Third of our Constitution vests "the legislative
power of this State" in "two distinct houses or branches;
the one to be styled The Senate, the other The House of
Representatives, and both together The General Assembly.
The style of their laws shall be, *Be it enacted by the Senate
and House of Representatives in General Assembly convened.*"
The term *laws*, as thus used, clearly denotes action of the
General Assembly in its legislative capacity. Their style
must be that of enactment. They are the outcome of a bill
for an Act which has been presented to the governor for his
approval. Const., Art. IV, § 12. Soon after the adoption
of our Constitution, a difference of opinion arose as to
whether any participation by the executive was required in
legislation in the form of a Private Act. Governor Wol-
cott, who had been the president of the constitutional con-
vention, during the ten years that he held the chief execu-
tive magistracy, always claimed that it was; but Private
Acts were nevertheless occasionably passed, while he con-
tinued in office, which were not presented to him. Under
later governors such instances of private legislation without
executive participation were more frequent, and while a
case (*Skinner* v. *Hartford Bridge Co.*, 29 Conn. 523, 532)
was under argument in this court in 1861, MR. JUSTICE

ELLSWORTH observed from the bench that the question as to the constitutionality of such a course remained unsettled, and that grants of money were generally passed without being sent to the governor for approval. John Hooker, Reminiscences, 131. The first statute expressly requiring the presentation of bills for Private Acts to the governor was enacted in 1860. Public Acts of 1860, p. 3, Chap. 1. In 1859 it had been impliedly required, and the style of such an Act also prescribed as " *Resolved by this Assembly.*" Public Acts of 1859, Chap. 2, § 4. The validity of any law enacted under a style different from that prescribed in the Constitution has been questioned and never directly settled. *Clapp* v. *Hartford*, 35 Conn. 220. But the power of the General Assembly, as a public body and outside of legislation, to pay its officers and employees an extra or gratuitous compensation by grant has never been questioned.

The first revision of the statutes after the adoption of the Constitution contained the provision that " each house of the general assembly are hereby authorized and empowered to make out their respective debentures, and to make the grants necessary and proper to cover their contingent expences; which, being duly registered in the comptroller's office, shall be paid by the treasurer." Rev. 1821, p. 258, § 4. This revision was framed for the special purpose of rendering our statutes conformable to the new Constitution (Rev. 1821, p. VIII), and the foregoing provision is plainly declaratory of the meaning of the Constitution and has ever since remained upon our statutes. Rev. 1902, § 31. Besides such grants by each house severally, grants of money, effected by orders on the treasury, have often been made by both houses acting jointly, and were provided for in the last revision of the statutes before the adoption of Article Twenty-Four. Rev. 1875, p. 81, § 21. When, therefore, Article Twenty-Four of the Amendments was proposed to the people, it was within the power of the General Assembly to add to the salary of a public officer by occasional grants of money from the treasury, not by way of legal compensation, but as a gratuity in addition to the legal compensation. This power of

paying gratuities, shared in kind although not in degree by the General Assembly and the other public bodies named, Article Twenty-Four prevented for the future.

It therefore plainly appears from these dominating words of the sentence, not only that the power limited is one held in common by each of the bodies named, but also that the power limited cannot be the power of legislation. Having thus defined the character of the power which is its subject, the sentence goes on: " to pay or grant any extra compensation to any public officer, employee, agent, or servant." An extra compensation is one in addition to, in excess of, or larger than, the compensation prescribed by law or settled by contract; one the payee is not entitled by law to demand, nor the payor obliged to pay. The payment of such gratuitous compensation is forbidden to the six specified bodies, but is not forbidden to other public bodies then existing or which might afterward be created. The presumption that a power which in proper cases may be justly and wisely exercised will be so generally abused that its exercise in any case should be prohibited, is applied only to the six specified bodies. The payment of gratuitous compensation to any officer, employee, etc., implies a payment to a particular person, and to a person who in some way holds the relation of officer or employee to the public body making the payment. It is evident that while legislation establishing compensation for future services at a sum larger than that established by previous legislation is not in any sense extra or gratuitous compensation, yet that a mere grant or increase of compensation beyond that established by law, the law remaining unchanged, is in effect the giving of extra compensation, and that the form of the grant is immaterial. It appears from the legislative records that devices of this kind were not unknown at the time Article Twenty-Four was framed.

The sentence goes on: " or increase the compensation of any public officer or employee, to take effect during the continuance in office of any person whose salary might be increased thereby." By these words any device by which the full force of the prohibition against extra compensation,

which is the subject of the sentence, might be evaded, is guarded against. Either the General Assembly or any county, etc., might grant an increase of compensation which would involve a payment to that person of a compensation in excess of that established by law, and which would therefore be a gratuitous compensation, and so it is provided that neither the one nor the other shall have power to increase the compensation of any public officer, not absolutely, but so as to take effect during the continuance in office, not of any public officer, but of any particular person whose salary, or compensation established by law, might in this way be increased, and thus an extra or gratuitous compensation, that is, larger than the one established by legislation, might in fact be paid. It is obvious that the circumlocution used in the phrase limiting the prohibition against increasing "the compensation of any public officer," to one that is to "take effect during the continuance in office of any person whose salary might be increased thereby," is only explicable by construing it as intended to reach grants not in the shape of law; and that, with or without that limitation, the plain import of the words used is to take alike from General Assembly, county, and school district, the power which each has of paying a gratuitous compensation by the mere grant of an increase to the compensation established by legislation.

To bring clearly within the operation of its prohibition every employee of the bodies named, the sentence goes on : " or increase the pay or compensation of any public contractor above the amount specified in the contract."

The purport of the sentence is the same, whether we examine it closely word by word, or read it, as every constitutional provision must be read, broadly, giving emphasis to clear essentials and disregarding narrow and mere technical criticism. Thus read, the plain purport of the sentence is : the power of rewarding public officers and employees by payment of a compensation in excess of that to which they are entitled by law, having been exercised alike by General Assembly, county, city, etc.,—it is enacted by the sovereign,

to whom all public bodies and subjects alike owe implicit obedience, that henceforth neither the General Assembly nor any one of the other public bodies shall have power to pay or grant, to any public officer, employee, or contractor, any compensation, either as extra compensation or increase of compensation, beyond the amount established as his compensation by legislation or by the terms of any contract he may have entered into. The people discovered a peculiar evil arising from a practice followed alike by General Assembly, county, city, etc., and they enacted a peculiar law, framed with careful precision to remedy that evil. This is the supreme law and must be given a broad interpretation, adequate to the accomplishment of its evident purpose. But there is in this law no implied limitation on clearly granted powers of legislation, except this one : legislation cannot authorize acts which the Constitution forbids, and no law can be enacted authorizing either the General Assembly, or any county, etc., to make the grants or payments which they are forbidden to make by Article Twenty-Four. To infer a limitation upon the power to enact laws establishing the compensation of public officers would be an inference purely arbitrary, not drawn from any facts. The establishment of compensation by legislation is the necessary condition to any application of Article Twenty-Four, which deals not with legislation but only with acts forbidden because they are not legislation. The General Assembly was established as a public body for the great purpose of being made the depositary of legislative power, and is concerned mainly with the enactment of laws ; but as a public body it is also concerned with acts which are not legislation, and it is in its relation to these acts, and to these acts only, that it is named in the Article. It would involve unnecessary repetition to further illustrate the certainty of this fact. It needs the excision of essential words, or the addition of a distinct paragraph, to lay a foundation for the supposed limitation on the power of legislation. If we cut out of the sentence the first word, and the words "nor any county, city, borough, town, or school district," and insert the word "not," so

that the sentence shall read : " The General Assembly shall not have power," etc., there would be some ground for an implication that the General Assembly is referred to both in the exercise of its power of legislation and of its powers as a body politic. But by this forcible treatment of its language we shall have destroyed Article Twenty-Four and created another and different Article, which the House and Senate never proposed and approved and the people have never adopted. Or if we add to the sentence another paragraph : " No law shall be passed which can operate to alter the compensation of any public officer unless by decreasing the same," the Article would then plainly cripple an important power of legislation. But the Article thus forcibly changed would no longer be Article Twenty-Four, but a wholly different one, which there is no reason to believe would have been proposed or adopted.

The sentence is framed for the particular and peculiar purpose of taking alike from General Assembly, county, etc., the power each has as a public body of paying gratuitous compensations to public officers or employees, and is so framed as to exclude any implication of a limitation upon the power of establishing by law appropriate compensation for all public officers, which is possessed by the General Assembly alone as the depositary of the legislative power of the State. Suppose this power of paying gratuities had been questioned, or did not exist, and the sentence had been framed for the purpose of clearly giving this power alike to General Assembly, county, etc., without extending to any other body the exclusive power of legislation vested in the General Assembly. This purpose would manifestly have been effected by merely changing the first word of the sentence " neither " and its following correlative " nor " into the words " either " and " or." With the prohibitive " neither," the sentence does not cripple nor refer to the power of legislation vested in the General Assembly alone, any more than with the permissive " either " the power of legislation possessed by the General Assembly alone would be extended to a county or other public body named.

The construction of this sentence is such that it is is impossible to infer a meaning different from its plain import, without answering certain determinative questions that blaze from every line. Why is the power, which is its subject, denied alike to General Assembly, county, city and other subordinate public bodies? Why is the power, taken away alike from each public body, defined primarily and absolutely as the payment of a compensation gratuitous, because in addition to that established by law or by contract? Why is the power taken away from each body defined secondarily as the power to increase a compensation in such manner as in the case of a public officer or employee will involve a payment to the person holding the office or employment of a compensation larger than his salary which is established by law, and in case of a public contractor larger than his compensation specified in his contract? Why is the power to increase the compensation of a public officer, which is taken alike from each public body, defined in language inexplicable unless applied to the grant or payment of a compensation gratuitous because in addition to that established by legislation? There is but one answer to these questions: the sentence is dealing solely with the grant or payment of a compensation gratuitous because in addition to that established by law or by contract; is dealing with a power which is common alike to General Assembly, county, etc., because, and only because, it is not the power of legislation vested by the Constitution in the General Assembly alone. The sentence is openly framed for this purpose, as well as for the purpose of excluding any implication of a limitation of the power of establishing by legislation the compensation of public officers as the exigencies of the public service may require; the actual exercise of which power is in fact essential to create the conditions, when and when only the power in reality forbidden might be called into operation. The affirmative exclusion of any limitation upon the clearly granted power to legislate in respect to the compensation of public officers is thus made known in the structure of the sentence and its every term.

McGovern *v.* Mitchell.

But if we can assume that some doubt remains of an implication affecting the exercise of legislative power, such doubt must yield to the imperative and settled rule of construction, that the appropriate exercise of a clearly granted power of legislation is not restricted unless by force of some express provision or necessary implication contained in the Constitution. And where the validity of a particular Act depends upon the doubtful application to that Act of some uncertain implication, the action of the court is fettered by a rule so long established and so firmly settled that its observance has become compulsory. It is well stated by Chief Justice Shaw : When courts are "called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." *Wellington, Petitioner*, 16 Pick. (Mass.) 87, 95 ; *Ogden* v. *Saunders*, 12 Wheat. (U. S.) 213, 270.

There is another consideration of weight specially applicable in the construction of our own Constitution. It is a distinctive feature of our Constitution, affecting its motive and pervading its spirit, that the broad grant of legislative power to the General Assembly, while effectually limited by the provisions dividing the government into distinct departments and those relating to the operation of the State government, and by the fundamental maxims contained in Article First, yet the appropriate exercise of that power by the representatives of the people, subject to these limitations, should not be restricted nor hampered by detailed directions aiming to control the legislative discretion and judgment. For nearly a century the people have persistently maintained this distinctive feature and steadfastly resisted attempts at its modification, and an amendment fairly and reasonably consistent with this principle should not be made to weaken

it by a forced construction. Chief Justice Chase, in apply-
ing this rule to an amendment of the United States Consti-
tution, said : " It is true that no limit can be imposed on the
people when exercising their sovereign power in amending
their own constitution of government. But it is a necessary
presumption that the people in the exercise of that power,
seek to confirm and improve, rather than to weaken and im-
pair the general spirit of the constitition." *Griffin's Case*,
11 Fed. Cas. (No. 5,815) 7, 26.

Stress was laid in argument upon certain considerations
sometimes resorted to where the meaning of language used
is doubtful. An examination of the published discussion
when the amendment was approved and of public comments
attending its approval and subsequent adoption, if such mat-
ters could properly be referred to for any purpose, would
throw little light on the question, unless as indicating the
concentration of attention to the prohibition of the payments
of gratuitous compensation, and the absence of dissatisfaction
with previous legislation and of any apparent suspicion that
the proposed amendment would cripple or hamper the exer-
cise of the power of legislation. It may be appropriate, how-
ever, to refer to the fact that in 1876 the House of Repre-
sentatives, five days before passing the resolution proposing
the amendment relating to extra compensation to public of-
ficers, passed a resolution proposing an amendment relating to
special legislation, by which former amendment it was pro-
vided that the General Assembly should pass no special
act " creating, increasing, or decreasing fees, commissions,
or salaries of public officers during the term for which such
officers are elected or appointed," and that the General As-
sembly should pass general laws for that purpose. The
former amendment dealt with the power of legislation con-
cerning the compensation of public officers, limiting that
power to the passage of general laws. The latter amendment
did not deal with the power of legislation, but forbade the
payment of gratuitous compensation by either the General
Assembly or any county, etc., whether their compensation
had been established by general or special act. The latter

amendment was approved by the Senate and House in 1877 by the requisite two-thirds vote; the former amendment was disapproved by a vote substantially unanimous. The people, whether represented in constituent or legislative assembly, have heretofore uniformly refused to impair by special limitations the necessary use of discretion and judgment by their representatives, in the exercise of the powers of legislation vested in them.

No inference can be drawn, relative to the operation of the amendment upon the power of legislation, from the decisions in the three cases which have arisen under the amendment. All were concerned with the payment of compensation by a city to its officers. In one, the proposed payment was held lawful, and in two it was held unlawful. In *Smith* v. *Waterbury*, 54 Conn. 174, we held that a new appointment of the city officer after the alleged increase of compensation and before the rendition of the services in question, was sufficient reason for refusing to interfere with the payment challenged. *Garvie* v. *Hartford*, 54 Conn. 440, was a plain case of payment, by a city council, of extra compensation to its members. In *Wright* v. *Hartford*, 50 Conn. 546, the city had done the precise thing forbidden by the amendment. On the last evening of the municipal year the common council had by vote granted to the tillerman of a particular fire company a larger salary than that established by ordinance. The vote did not, and could not, alter the ordinance. The payment of the increase would have been the payment of a gratuitous compensation. It was urged on behalf of the tillerman that the nature of his employment did not fairly bring him within the meaning of "public officer or employee." Journal of Court of Common Council, 1882; Records and Briefs of Supreme Court, 1st Dist., January Term, 1883. We held that the increase thus granted was gratuitous compensation, stating that it was the clear intent of the amendment to render impossible the payment of gratuitous compensation to any public officer or employee whatever his grade, from the highest to the lowest. Neither of these cases was concerned with the

question now before us, that is, the limitation of the power of legislation by any provision of the amendment; it was not in either case discussed or considered by the court. Notwithstanding the legislature has repeatedly, within the past thirty years, enacted laws regulating the compensation of public officers, operating both to increase and decrease the pay of existing officers, the right to so exercise this legislative power has never been challenged by any judicial proceeding until the commencement of this action.

As to any inference that may be drawn from legislative practice, we find that the House and Senate of 1877, in the Act submitting the amendment to the people for their approval, defined the purpose of the amendment as "prohibiting extra compensation to public officers"; and every elector voting to approve this amendment cast a ballot signifying his approval of an amendment ".prohibiting extra compensation to public officers." At the same session the legislature illustrated its plenary control of this subject by legislation in an Act by which the compensation of nearly every officer in every branch of the public service was diminished; excepting from its operation the judges of the two constitutional courts. At the same session the legislature by Public Act established the compensation for messengers and doorkeepers, and declared that the General Assembly should not be permitted or allowed to pay any extra compensation or gratuity. Public Acts of 1877, p. 161, Chap. 29. At the session of 1878, held a few months after the adoption of the amendment, an Act was passed by which the compensation of the then judges of the Court of Common Pleas for Hartford and Fairfield counties was altered and increased to the amount at which it had been established before its alteration and reduction by the legislation of the previous year (p. 323); another Act establishing a salary for the surgeon general in addition to existing regulation for his compensation (p. 322); another Act by which the compensation of the then State librarian was increased (p. 352). In 1879 an Act was passed increasing the compensation of all officers whose compensation had been altered

and diminished by the Act of 1877 (p. 426); another Act by which the compensation of the then justices of the peace was increased (p. 383); another Act providing compensation for State's attorneys by salaries instead of fees, which operated to increase or decrease the compensation of four of the then State's attorneys (p. 458). In 1882 there was similar legislation applying to existing officers affecting the State reporter (p. 137) and county commissioners (p. 213); also in 1883 (p. 311); in 1884 (pp. 323, 370); in 1886 (pp. 559, 622); in 1889 (pp. 48, 103, 118, 130); in 1893 (pp. 258, 279); in 1895 (p. 503); in 1897 (p. 966); in 1901 (pp. 1189, 1239); in 1903 (pp. 46, 82); and in 1905 (pp. 417, 451, 483, 484). Such legislation has affected the compensation of officers in different branches of service, including judges of inferior courts and justices of the peace, the national guard, State referee, State's attorneys, State reporter and State librarian, county commissioners, sheriffs, deputy-sheriffs and prosecuting agents, executive clerks, superintendents of the State House, and officers of the different bureaus of labor statistics, State board of health, and dairy commissioner. Where an Act altering the compensation of a single officer was passed near the close of his term of office, it usually provided that the change should commence with the next term, unless the passage might be delayed until after the term had commenced, in which case the change would be made applicable to the recently appointed officer. Public Acts of 1905, p. 451, Chap. 248. In 1881, when a compensation was re-established in recognition of the duties of the chief justice distinct from those of associate justices, the Act was made applicable to future chief justices, and the same Act in providing an allowance for necessary expenses of judges while holding terms of court, made the provision applicable to future judges (p. 63, Chap. 114); in 1893 (p. 215, Chap. 29); and in 1903 (p. 97, Chap. 137) a different and opposite course was followed. Some Acts regulating the compensation of a number of officers would operate to increase that of some and diminish that of others. Whatever may have been the inducing mo-

tive in particular instances for increasing or decreasing the compensation, for giving effect to the altered compensation at the date of the passage of the Act or a future date, for making the altered compensation applicable to present or future incumbents, it is evident that legislation, from the first proposal of the amendment to the present time, has been a continuous assertion and practice of the right to regulate the compensation of various public officers by diminution or increase affecting present or future incumbents as the legislature, at the time, deems will best serve the efficiency of the public service and the public interests. In case of doubt this might have great weight, but we think the language of Article Twenty-Four so plainly excludes any limitation upon this power of legislation that such practice does not materially strengthen the force of that language, and would not materially weaken it if the practice had been different. The Constitution speaks with an ever present authority. Popular misapprehension, *dicta* of judges, improper or inadvertent legislation, cannot alter the plain mandates of the Constitution when expressed in clear and certain terms.

In view of all the considerations advanced by counsel and those suggested in the course of a thorough study of the subject, we think that Article Twenty-Four is a plain mandate addressed to the public bodies named, including the General Assembly, forbidding each to exercise the power it may have as such public body to use the public money under its control for the payment to any public officer, employee, or contractor, in any form or by any device, of any compensation in excess of that established by legislation or by contract; that the language of this Article cannot support any implication of a limitation upon the exercise of the power of legislation for regulating the public service and the compensation of public officers; and that in enacting this amendment the people had no intention of changing a distinctive feature of our Constitution, which demands of the legislature in the appropriate use of clearly granted powers of legislation a wise discretion, unhampered by detailed directions, and

makes its members responsible for such use to the people they represent; or of incorporating in our Bill of Rights a novel fundamental maxim, uncertain in scope and harassing in operation. If the proposition advanced by the plaintiff, namely: legislation for the regulation of the public service, which affects the compensation of existing officers, may properly operate to diminish but never to increase that compensation,—shall come to be regarded as so clearly sound, wise, and just, that it ought to have the force of a fundamental maxim, it may be given that force by the sovereign power by which alone constitutions are enacted. We have not found in the constitution of any other State to which our attention has been directed, any recognition of such a proposition as a fundamental maxim, and after careful examination we are unable to discover this maxim either in the form of express statement or of necessary implication within the lines of the Constitution of this State.

In the study of this case we have sedulously searched for a suggestion that might consistently with reason and authority lead to a different conclusion. The only suggestion we have found of seeming plausibility is the one already discussed, which may be stated in different forms. The pivotal test is that which determines the presence in Article Twenty-Four of the limitation claimed upon the exercise of legislative power. If we could insert in the sentence after the words "Neither the General Assembly," the words "by legislation or otherwise," there would be some expressed limitation, but it would only be the limitation implied without these words, namely, the want of power by legislation to authorize the act forbidden, i. e., the payment of a compensation, gratuitous because not established by law. To extend such limitation so as to include the limitation claimed, we would be obliged to go farther and insert after the next passage commencing "or to increase," etc., the words "or to enact any law which may operate to establish by law for any public officer a different and larger compensation." Such violent treatment of the language of a constitutional provision, if ever justifiable, can only be so when necessary to

give effect to the evident purpose of the provision; but when used to give effect to a purpose carefully excluded by the language of the provision, and to create a provision evidently not intended, which modifies an important distinctive feature of the Constitution, such treatment becomes unjustifiable, and for a court impossible.  Action of this kind would be the usurpation on our part of the power vested in the people alone by the creation of a constitutional provision of far reaching consequences.

For the reasons given we think that chapter 213 of the Public Acts of 1905, as well as any general law establishing for the future the compensation of public officers, is not unconstitutional, but is a valid exercise of a legislative power; and is none the less valid because it may also be the performance by the legislative department of a duty imposed upon it by the Constitution in respect to the judicial department.

The Superior Court is advised to sustain the demurrer upon the grounds stated in the second specification, and render judgment for defendants.

Costs in this court will not be taxed against either party.

In this opinion the other judges concurred.