THE BOARD OF WATER COMMISSIONERS OF THE CITY OF HARTFORD *vs.* JOSEPH W. CURTIS.

First Judicial District, Hartford, October Term, 1913.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

A grant to a municipal board of the right to condemn private property for public use is not a "law" within the meaning of that word in section one of the third Article of the Constitution of this State which provides that the style of the "laws" of the General Assembly shall be: *Be it enacted by the Senate and House of Representatives in General Assembly convened;* and therefore the bestowal of such

authority in the form "Resolved by this Assembly" is constitutional and valid.

It is within the power of the General Assembly to validate and confirm its enactments which were not made originally in the constitutional form, and this it may do by reference, without an independent re-enactment of the original Act or a repetition of its language; and from the date of such confirmation the Act speaks the legislative will authoritatively and in legal form.

A practical construction placed upon a constitutional provision immediately after its adoption and consistently followed in repeated instances for nearly a century thereafter, is most persuasive if not well-nigh conclusive as to its meaning.

Argued October 9th—decided December 20th, 1913.

PETITION for the appointment of appraisers to estimate the amount of compensation which should be paid to the respondent for taking a strip of his land for the purpose of constructing and maintaining a line of water pipes therein, brought to the *Hon. William S. Case*, a judge of the Superior Court, who overruled a demurrer to the petition and rendered judgment for the petitioner, from which the respondent appealed. *No error.*

*Francis E. Jones*, for the appellant (respondent).

*William Waldo Hyde* and *Edward M. Day*, for the appellee (petitioner).

PRENTICE, C. J.  The plaintiff, acting under the authority of a resolution of the General Assembly approved August 2d, 1911, and being No. 367 of the Special Laws of that year, brought this petition to acquire by condemnation the right of constructing and maintaining a pipe line through the land of the defendant.  He contends that it is without power to so acquire his property, for the reason that the attempted bestowal of authority by the resolution was ineffective, since it

was adopted in violation of a provision of our State Constitution, which prescribes that the style of the laws of the General Assembly shall be, *"Be it enacted by the Senate and House of Representatives in General Assembly convened."* Article Third, § 1.

It would be a sufficient answer to this contention, as related to this proceeding, which was not begun until July 23d, 1913, to refer to chapter 297 of the Public Acts of 1911, p. 1609, approved September 26th, 1911, wherein, under the constitutional enacting clause, all joint resolutions for Special Acts theretofore passed by the General Assembly and approved by the Governor, at any time since the adoption of the Constitution of the State, under the style of *"Resolved by this Assembly,"* were, as to any irregularity by reason of the use of such style, validated and confirmed, and each of such resolutions declared as valid as if it had been passed under the style of *"Be it enacted,"* etc. By this legislation the Special Act in question, even if it failed of effective original adoption, became enacted into law. From that time, if never before, it spoke the will of the legislative department. The General Assembly then had authority to act in the premises, the action was in constitutional form, and the particular matter enacted was unmistakably indicated by reference. Neither independent re-enactment nor enactment by repetition of the language of the Special Act was necessary. *Allison* v. *Corker,* 67 N. J. L. 596, 603, 52 Atl. 362. The situation, in so far as the present proceeding is concerned, presents no question of retroactive legislation. It is solely one as to present power to act, and action in legal form.

Our conclusion that the plaintiff is acting under authority legally conferred does not, however, find its real foundation in the provisions of the Public Act approved September 26th, 1911. The prior Special

Act was adopted in lawful form, and became effective as a special grant of power to the plaintiff.

The constitutional provision which the defendant relies upon uses the word "laws" to describe the action of the two Houses of the General Assembly, which must conform to the style prescribed. It is "their laws" which must contain the specified language of enactment. The word "laws" is not one of fixed and certain meaning. It is used broadly to include all written expressions of the governmental will, and, still more broadly, to include not only them but also "all other rules of property and conduct in which the supreme power exhibits, and according to which it exerts, its governmental force." Anderson's Law Dictionary, p. 600. In common speech it is frequently employed more narrowly to designate those legislative enactments which undertake to prescribe the rights and duties generally of those who are subjects of the sovereign power, and to regulate their conduct. To ascertain the scope and meaning of the constitutional mandate, we must therefore seek to discover the sense in which the makers of the Constitution used the term whose employment has given rise to the present controversy. What did they intend should be embraced within it? Did they use the word "laws" in the comprehensive sense, which would include all action by the two joint bodies, or did they use it to designate something less?

Joint action of the two Houses covers a wide range of subjects, and is had for a great variety of purposes. It may be called for in the conduct of the affairs of the State itself, as, for example, in the appointment of its officers, in the care and management of its property, in the regulation of its finances, and in the ordering generally of its affairs. It may concern the civil or social status of individual subjects, and have no wider range of operation, as where a pardon is granted, as

was formerly frequently done, or forfeited rights restored, or names changed. It would sound strangely to have legislative action of either of these two groups classed as laws, and it would seem altogether inappropriate that the expression of the legislative will therein should be required to take the form of an enactment. Our fathers evidently shared these views, for an enacting clause was not used by them in connection with such legislative action.

But there is a large variety of legislation which lies outside of either of these two fields. Some of it is that which is familiarly classified as general law, to wit, that which affects the community at large, and so expressed as to be capable of application throughout the jurisdiction of the lawgiver. Other portions of it, being confined in its application to particular persons or associated groups of persons or localities, falls into the other recognized class of special or private law.

Did the framers of the Constitution intend to embrace all such legislative action in the term "laws," and thus require it to take on the form of an enactment, and if not, where did they intend that the dividing line should be drawn between what should be adopted by the use of the constitutional formula and what need not be?

We should expect to find some light shed upon this subject by the conditions prevailing at the time that the provision was made. Then, again, if there was a practical construction of the provision given by the General Assemblies of the years immediately following 1818, in the forms which their legislation assumed, such contemporaneous construction would also furnish substantial aid to interpretation. This would be peculiarly so in the present instance, since during those years a considerable number of the members of the constitutional convention were members of the General Assem-

bly, and among them were not a few who have held high place in public position and esteem as lawyers and judges. Oliver Wolcott, president of the convention, was himself Governor until 1827. It would be difficult to conceive of such men as Governor Wolcott, Zephaniah Swift, Thomas S. Williams, and Ralph I. Ingersoll, either misunderstanding or wilfully ignoring the constitutional mandate they had helped to frame. The value of such practical construction is well recognized, and especially so where the participants in it are men of repute as lawyers and judges. Endlich on Interpretation of Statutes, p. 743; *Ogden* v. *Saunders*, 25 U. S. (12 Wheat.) 213, 290; *McPherson* v. *Secretary of State*, 92 Mich. 377, 383, 52 N. W. 469; *Sage* v. *Wilcox*, 6 Conn. 81, 89. Mr. Justice Johnson, in *Ogden* v. *Saunders*, 25 U. S. (12 Wheat.) in speaking of this principle, said (p. 290): "It proceeds upon the presumption, that the cotemporaries of the Constitution have claims to our deference on the question of right, because they had the best opportunities of informing themselves of the understanding of the framers of the constitution, and of the sense put upon it by the people when it was adopted by them."

If it should be further found that a usage disclosing contemporary construction developed into one long continued, consistent, and abundant in its instances, that fact would furnish high evidence of what the true meaning of the doubtful language was, and present a strong claim to present acceptance by us. It is a familiar rule of statutory and constitutional construction that such usage, while not absolutely binding upon the courts, is entitled to great weight. *State* v. *South Norwalk*, 77 Conn. 257, 264, 58 Atl. 759. "It shows a practical construction put upon the law, which is to be regarded as high evidence of what the law is." *Mattoon's Appeal*, 79 Conn. 86, 90, 63 Atl. 784; *Brown*

v. *Congdon*, 50 Conn. 302, 309; *Newton's Appeal*, 84 Conn. 234, 241, 79 Atl. 742. It would require very cogent reasons to change it at a later date. *Huntington* v. *Birch*, 12 Conn. 142, 149. The courts of other jurisdictions are not less emphatic than we have been in holding that such usage is most persuasive in the matter of construction. Some of them have held that it was well-nigh conclusive, while others have come near to regarding it as conclusive where it was sufficiently long continued and uniform. *Stuart* v. *Laird*, 5 U. S. (1 Cranch) 299, 309; *Lavery* v. *Commonwealth*, 101 Pa. St. 560, 563; *Harrison* v. *State*, 22 Md. 468, 491.

An examination of the history of our legislation prior to the adoption of the Constitution and subsequent thereto down to the present time, is peculiarly illuminating upon the subjects of inquiry. Before the adoption of the Constitution certain expressions of the legislative will contained the enacting clause, *"Be it enacted by the Governor and Council and House of Representatives in General Court assembled"*; others took the form of a resolve. The resolves included charters of incorporations, grants to academies, agricultural societies, church and charitable societies, libraries, manufacturing and business corporations, and aqueduct, canal, ferry, wharf, and turnpike companies, and legislation establishing and discontinuing highways, establishing highway and school districts, creating towns and boroughs and fixing and changing their bounds. Practically all the legislation touching these matters was in the form of resolutions. Especially worthy of notice is the use of this form where public and *quasi*-public corporations were concerned, and where the grant to them of the power of eminent domain was made. All of the legislation creating towns and defining and changing their boundaries was by resolution. The five city charters which were granted were all by enact-

ment, but the reason for this distinction is not hard to discover in the character of certain of their provisions. All the numerous Acts organizing or conferring powers upon or regulating the affairs of bridge and turnpike companies, upon several of which the power of eminent domain was bestowed, were resolutions. See, for example, that incorporating the Bridgeport and Newtown Turnpike Company, passed in 1801 (2 Private Laws, p. 1212), and that in alteration of the charter of the Green Woods Turnpike Company, passed in 1811 (ibid. p. 1285). The power of eminent domain was also, in 1802, conferred by resolution upon the Sharon Aqueduct Company. 1 Private Laws, p. 59.

Passing now to the legislation of the years which immediately followed the adoption of the Constitution, no change in practice is observable. It continues along precisely the same lines as before. The volume of special legislation began to increase, but the kinds of legislation which, prior to 1818, had taken the form of a resolution continued to do so. The resolves covered the whole field already indicated as formerly covered by them. Manufacturing and business and other purely private corporations were incorporated in increasing numbers. Creations of aqueduct, canal, ferry, and turnpike companies, and others of a kindred character, also multiplied, and, where needed, the right of eminent domain was given to them. A resolution was used in practically if not every one of these instances. Towns were organized, and their bounds fixed and changed as before by resolution uniformly. The same was true of boroughs, save in a few instances. Railroad incorporations began to appear, and in every instance contained in the compilation of 1837 they were accomplished by resolution.

The legislation from the period of 1836 to 1911 discloses the same pertinent features as does that which

preceded it.   During this period an immense mass of special legislation by resolutions was adopted, and much of it was of the highest importance and involved large interests.

Examining the legislation thus reviewed, it becomes apparent that the recognized distinction between general and special legislation was a familiar one to the lawmakers of 1818 and long prior thereto; that it was observed by them in their attempt to comply with the constitutional mandate as interpreted by them, and by their successors in legislation down to recent date, in the differing form in which each class was framed, and that their practice covering this whole period was to formulate general legislation in the form of an enactment and special legislation as a resolution.   This rule was closely adhered to.   Occasionally, when the subject-matter or contents of the legislation lay close to the dividing line, there appears to have been some lack of uniformity in the method adopted upon different occasions.   The instances of this kind are, however, strangely few.   Where the legislation was in part public in its character, although essentially private in other portions, the form adopted naturally was that which was appropriate to the former class.   And so we find that banks were customarily incorporated by enactments.   City charters, with their provisions of a public character, also took the form of enactments.   But where the legislation, although in favor of a municipality, was private in its character, there was no hesitation in resorting to resolutions for its adoption.

But the legislative interpretation of the language of the Constitution as not applying to special legislation, and the recognition of a distinction between general and special laws in respect to the manner of their adoption, has not been disclosed by conduct alone.

The Revision of 1821 (p. 258) provided that all bills

for Public Acts should be engrossed and presented to the Governor for his approval, and that such acts or laws be published at the end of each session. No provision was made for presentation to the Governor of other legislation until 1860, or possibly, by implication, in 1859. Public Acts of 1860, Chap. 1, § 2; Public Acts of 1859, Chap. 2, § 6. Meanwhile a difference of opinion, dating back to Governor Wolcott's time, had existed as to the necessity of the presentation to the Governor of Private Acts, and it would appear that such presentation was not, to say the least, always made. *McGovern* v. *Mitchell*, 78 Conn. 536, 558, 63 Atl. 433; John Hooker, Reminiscences, 131. Private Acts appear not to have been printed, save as some may have been published in connection with the Public Acts, down to 1837. In this year a compilation of all the special legislation subsequent to the adoption of the Constitution was published in two volumes by authority of resolutions of the General Assembly. In 1837 a resolution directed the publication thereafter of the "Resolves and Private Acts" passed at each session. Special Acts of 1837 (Unab. Ed.) p. 13. In 1859 appears general legislation, touching private legislation, of a strikingly suggestive character. It was provided that "the style of all bills for private acts" should be, "*Resolved by this Assembly*"; that all Acts of incorporations, and Acts in alteration or amendment thereof, should be deemed Private Acts; that no such Act should be engrossed, signed, or published as a Public Act; that every Private Act should take effect upon its approval; and that the Secretary of State should cause "the private acts and resolutions" passed at each session to be printed and distributed. Public Acts of 1859, Chap. 2, §§ 4–6. Prior to this time the introductory resolution formula had not been constant. Customarily it was, "*Resolved by this Assembly.*" At times, however, it was,

"*Be it resolved,*" or the simpler, "*Resolved.*" This Act was followed the next year by another prescribing that all "bills for private acts" should be engrossed and recorded in the same manner as was provided for Public Acts, and, after examination by the engrossing committee of the General Assembly, thereupon returned to the Secretary of State for transmission to the Governor. Public Acts of 1860, Chap. 1.

Here we find formulated the regulations which in substance continued in force until 1911. Public legislation had long been the subject of regulation as to the steps to be taken in its progress toward enactment, approval, and publication. Now, for the first time, special legislation is subjected to such regulation, but the regulations relating to it are not the same as those touching general legislation. They differ in important respects, as, for example, as to the time of their taking effect, but in no feature is the difference more significant than in the matter of their respective styles. For a full half century these regulations in substance remained in force, and our legislation during that period has been formulated in compliance with them. This compliance, however, as we have already had occasion to notice, accomplished no essential change from antecedent usage.

In view of all this history, most unusual in respect to the continuity, uniformity, and extent of the usage shown, and most emphatic and distinct in its disclosure of contemporaneous interpretation, it would be rash to now declare that those who had, for substantially a century, shared in this interpretation and usage were mistaken in their exposition of the constitutional mandate, and acted without warrant or authority in matters of the highest concern submitted to them as legislators. As was said by the Supreme Court of the United States in a case involving similar conditions: "This practical

exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed." *Stuart* v. *Laird,* 5 U. S. (1 Cranch) 299, 309.

We are aware of no instance where a challenge has ever been made, either publicly or in the courts, of the propriety of the course pursued in the adoption of special legislation, except in the case of *Clapp* v. *Hartford,* 35 Conn. 221. In that case an attack appears to have been made upon the validity of a provision of the city charter upon the ground that it was adopted as a resolution. *McGovern* v. *Mitchell,* 78 Conn. 536, 558, 63 Atl. 433. It is difficult to discover how the decision made could have been arrived at without overruling this claim of invalidity. It is, however, not touched upon in the opinion, and the only logical conclusion which is apparent is that it was dismissed as not worthy of serious consideration.

There is no error.

In this opinion the other judges concurred.