GEORGE WALKINSHAW *v.* EDWARD J. O'BRIEN.
CHARLES LAFFIN *v.* NICHOLAS APALUCCI ET AL.
JOHN H. CASSIDY *v.* THE CITY OF WATERBURY.
LOUIS DEFELICE ET AL. *v.* ZONING BOARD OF APPEALS
OF THE TOWN OF EAST HAVEN ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued May 4—decided June 4, 1943.

The following argued the case for the parties ordered to show cause: *T. Holmes Bracken, Andrew D. Daw-*

son, *Victor M. Gordon, Maurice T. Healey, William B. Hennessy, Edward L. Reynolds, Joseph I. Sachs.*

*Richard F. Corkey,* assistant attorney general, with whom was *Francis A. Pallotti,* attorney general, and *Roscoe T. Steffen,* of the New York bar, as amici curiae.

MALTBIE, C. J. Of these four cases, three were brought to Courts of Common Pleas as they had existed before Chapter 283 of the 1941 Supplement to the General Statutes, establishing a single Court of Common Pleas throughout the state, took effect, but, by virtue of § 785f, were taken over and decided by that court; and the fourth case, *DeFelice* v. *Zoning Board of East Haven,* was an appeal from a municipal board taken directly to the Court of Common Pleas established by the act after it became effective. On April 14, 1943, after the cases had been argued on the merits, the Superior Court in Fairfield County, *Cornell, J.,* in the case of *Osborn* v. *Zoning Board of Appeals,* held that the legislature did not have the power under the constitution to establish the Court of Common Pleas as constituted in the act and that it never came into legal existence. In *Woodmont Asso.* v. *Milford,* 85 Conn. 517, 84 Atl. 307, speaking by *Prentice, J.,* we said (p. 524): "Whenever the absence of jurisdiction is brought to the notice of the court or tribunal, cognizance of it must be taken and the matter passed upon before it 'can move one further step in the cause; as any movement is necessarily the exercise of jurisdiction.' *Rhode Island* v. *Massachusetts,* 12 Pet. (37 U. S.) 657, 717; *Denton* v. *Danbury,* 48 Conn. 368, 372." See also *Marcil* v. *Merriman & Sons, Inc.,* 115 Conn. 678, 682, 163 Atl. 411. Mindful of that injunction and of the uncertainty created by the decision of

the Superior Court as to the validity of judgments which have been entered by the Court of Common Pleas since the act of 1941 went into effect and its right to hear and decide other cases, we cited counsel in the four cases to appear and show cause why the cases should not be dismissed for want of jurisdiction. In our study of the question we have had not only the benefit of the very learned opinion of *Cornell, J.,* and the arguments of counsel but also the assistance of the attorney general, through his deputy, Richard F. Corkey, and of Professor Roscoe T. Steffen, a member of the New York bar and of the faculty of the Yale Law School, both of whom argued the case and submitted carefully considered briefs.

Previous to the time when the act of 1941 took effect there was a Court of Common Pleas in each of five of our counties and one in the judicial district of Waterbury. General Statutes, § 5321 et seq.; Cum. Sup. 1939, § 1371e. In general these courts had exclusive jurisdiction in their respective counties or district of appeals from justices of the peace and from municipal courts when appeals from them were not required to be taken to the Supreme Court of Errors; Cum. Sup. 1939, § 1364e; they had exclusive jurisdiction of actions for legal relief wherein the matter in demand exceeded $100 but did not exceed $500, and of actions for equitable relief wherein the matter in demand did not exceed the last mentioned sum; they had concurrent jurisdiction with the Superior Court of all actions claiming either legal or equitable relief wherein the matter in demand exceeded $500 but did not exceed $2000, with an additional concurrent jurisdiction with the Superior Court of actions for foreclosure of mortgages or liens regardless of the extent to which the matter in demand might exceed $2000; General Statutes, Cum. Sup. 1939, § 1396e; and in criminal matters

they had exclusive jurisdiction of appeals from justices of the peace or municipal courts in the counties or district for which they were created. General Statutes, § 6397. The judge of each of these courts sat only in the county or district in which was located the court to which he was appointed. Each of these courts was a local tribunal as regards the county or district for which it was established. The 1941 act established a single Court of Common Pleas for the entire state, with sessions in each county and the judicial district of Waterbury; the judges were placed on circuit; the court was given exclusive jurisdiction of legal actions wherein the matter in demand exceeded $100 but did not exceed $2500, of equitable actions wherein the matter in demand did not exceed that sum, and of appeals from municipal boards, officers and commissions and from the liquor control commission; and concurrent jurisdiction with the Superior Court of actions for the foreclosure of mortgages or liens wherein the matter in demand exceeded $2500; General Statutes, Sup. 1941, §§ 808f-810f; and, with reference to appeals from justices of the peace and municipal courts and criminal proceedings, it retained the jurisdiction which the former Courts of Common Pleas had had, except that in civil cases appeals from justices of the peace and municipal courts were to be taken to the Court of Common Pleas in all counties, whereas previously in any counties not having Courts of Common Pleas they were required to be taken to the Superior Court.

Whether the General Assembly might under the constitution establish a Court of Common Pleas as set up in the 1941 act depends upon the effect of § 1 of Article V of our constitution, which, as printed at the beginning of the General Statutes, Revision of 1930, provides as follows: "The judicial power of the state

shall be vested in a Supreme Court of Errors, a Superiour Court, and such inferiour courts as the General Assembly shall, from time to time, ordain or establish: the powers and jurisdiction of which courts shall be defined by law." The first question which presents itself is as to the meaning to be given to the words "such inferiour courts." The "Superiour Court" had been established in May, 1711, as a trial court of general jurisdiction and was in existence when our constitution was adopted in 1818. 5 Col. Rec. 238; Statutes, 1808, p. 205. There can be no doubt that it was the intent of the constitution that this court should continue, with the essential characteristics it had previously possessed. See Statutes, 1821, p. 138. The meaning of the words "inferiour courts" is by no means so clear. Little help in determining that meaning can be gleaned from the Journal of the Constitutional Convention or from the contemporary reports of its doings which appeared in the Connecticut Courant. One of the first acts of the convention was to appoint a committee to draft a constitution. The draft of the section we are considering was adopted by the convention without change except for the matter of punctuation to which we shall refer later, and without a roll-call vote, which was the method of voting usually adopted when there appeared among the members of the convention any material differences of opinion; Journal, p. 41; nor does the newspaper report of the proceedings of that day contain any reference to any debate upon the provision. Connecticut Courant, September 15, 1818. The only other action taken with reference to this section by the convention was after the various provisions of the constitution as drafted by the committee had been approved and the question of any amendments to the document as a whole was opened. A motion was made to strike out from the sec-

tion the words "of Errors, a Superiour Court," and to insert in lieu thereof these words: "which shall consist of a chief judge, and not more than four other judges." The Journal entry is: "The motion was divided, and the question on striking out decided in the negative. So the motion was lost." Journal, p. 67. No roll-call vote was taken upon the proposed amendment and the only reference to it in the newspaper report is that an amendment was offered which would reduce the number of judges to five which did not pass. Connecticut Courant, September 22, 1818. Not much significance can be attached to the action on this motion to amend in view of the little attention it received, and it would be pure assumption to attribute to the convention in this matter any intention with reference to the meaning it attached to the words "inferiour court."

In the acts establishing the various counties of the state, provision was made for a county court in each of them; 2 Col. Rec. 35 (1666), 7 Col. Rec. 12 (1726), 10 Col. Rec. 56 (1751); Public Acts, 1784-1791, pp. 318, 329 (1785); and these courts were in existence when the constitution was adopted; they were called "courts of common pleas or county courts" and had in civil actions unlimited jurisdiction at law and jurisdiction in equity where the matter in demand did not exceed $335, and in criminal matters jurisdiction of offenses "not extending to life, limb, banishment, adultery, or divorce," or, except for the crime of horse stealing, "where the punishment shall [not] extend to confinement in new-gate." Statutes, 1808, p. 207. From these courts, in all but a few cases, an appeal might be taken to the Superior Court. Statutes, 1808, p. 37; see *Scovill* v. *Seeley*, 14 Conn. 238; *Denison* v. *Denison*, 16 Conn. 34, 37. In five of the cities of the state there were city courts with similar jurisdiction

from which appeals also might be taken to the Superior Court. Statutes, 1808, pp. 127, 143, 154, 167, 177, 185; see *Imlay* v. *Judges of the City Court,* 23 Conn. 445, 447. Probate courts also were in existence, and from them an appeal lay to the Superior Court. Statutes, 1808, pp. 209-212. All of these courts were of course well known to the framers of the constitution, and, not being specifically mentioned in that document, they were undoubtedly intended to be included in the words "inferiour courts." See *Brown* v. *O'Connell,* 36 Conn. 432, 446; *Alcorn* v. *Fellows,* 102 Conn. 22, 30, 127 Atl. 911.

It by no means follows, however, that the words "inferiour courts" are necessarily to be restricted to courts of a nature similar to those we have mentioned. The words are used not rarely in the constitutions and statutes of other states. They have no precise or technical meaning but have been interpreted in different senses. *Swift* v. *Wayne Circuit Judges,* 64 Mich. 479, 481, 31 N. W. 434; *State ex rel. Harvey* v. *Medler,* 19 New Mex. 252, 259, 142 Pac. 376. It has been said that sometimes they do not relate to the intrinsic nature of the court but merely to the relative rank of one court as compared to another. *Swift* v. *Wayne Circuit Judges,* supra, and see *Croasdale* v. *Atlantic Quarter Sessions,* 88 N. J. L. 506, 511, 97 Atl. 285; *Houston* v. *Royston,* 7 How. (Miss.) 543, 550. In *Beaubien* v. *Brinckerhoff,* 3 Ill. 269, 274, the municipal court of Chicago, having within that city concurrent jurisdiction with the Circuit Court of Cook County, a court of general jurisdiction, was held not to be an inferior court; yet in *People ex rel. Sokoll* v. *Municipal Court,* 276 Ill. App. 102, 118, that municipal court was held to be "inferior" to the Circuit Court as regards the issue of a writ of prohibition, because the former was limited in jurisdiction to the city of Chicago while the latter had juris-

diction throughout the county and, when the case was decided, in certain respects a more extended jurisdiction. In some instances the distinguishing element has been found to be that the judgments of the court held to be inferior are subject to review in another court, but some of these decisions recognize that this has not given to those words the sense in which they were often used at common law. *Harris* v. *Vanderveer's Executor,* 21 N. J. Eq. 424, 451; *State ex rel. Harvey* v. *Medler,* supra; *Sanders* v. *State,* 55 Ala. 42, 44; *Kirkwood* v. *Washington County,* 32 Ore. 568, 571, 52 Pac. 568. Such courts are no doubt inferior courts, "but they are not therefore inferior courts in the technical sense of those words. They apply to courts of a special and limited jurisdiction, which are erected on such principles that their judgments, taken alone, are entirely disregarded, and the proceedings must show their jurisdiction." *Marshall, C. J.,* in *Kempe's Lessee* v. *Kennedy,* 5 Cranch (9 U. S.) 173, 185, 3 Law Ed. 70; and see *Grignon's Lessee* v. *Astor,* 2 How. (43 U. S.) 319, 341, 11 Law Ed. 283; "What tests are to be applied in determining the question of inferiority? It may be solved by showing that the court is either placed under the supervisory or appellate control of . . . [other courts], or that the jurisdiction conferred upon it is limited and confined. Conceding that the act in question does not place the court which it creates under the supervisory control of the circuit court, and only allows appeals and writs of error to be prosecuted directly to the Supreme Court, yet it will still be an inferior tribunal if its jurisdiction is limited and inferior." *State* v. *Daniels,* 66 Mo. 192, 201; see also *State* v. *Fillebrown,* 2 S. C. 404, 407; *Burks* v. *Walker,* 25 Okla. 353, 355, 109 Pac. 544.

The origin of the term "Superiour Court" as used in our act of 1711 is to be found in an act passed in

Massachusetts in 1699 which our statute as regards the jurisdiction of that court substantially followed. 1 Acts and Resolves of the Province of Massachusetts Bay, p. 371. The first use of the words "inferiour courts" in our law which we have found was in the act of 1711, which was entitled "An Act for establishing Superiour Courts, and altering the times of holding the County or Inferior Courts, in the several Counties of this Colony," and in which the words "county courts" and "inferior courts" are at times used interchangeably. It is, however, to be noted that in 1711 there were no courts in existence except the Superior Court and county courts, city courts not having then been established and probate jurisdiction being vested in the county courts. Statutes, 1808, p. 210, note. It is a reasonable assumption that the word "inferior" was used in the act of 1711 merely in contradistinction to "superiour," and, as has already been noted, when the constitution was established inferior courts other than county courts had come into existence and, not having been mentioned in the constitution, must have been included in the words "inferiour courts." That these words were intended to have no narrow meaning appears from a change in phraseology in a statute authorizing the Superior Court to issue writs of prohibition. As originally adopted in 1740, the Superior Court, the chief judge, or "any two of the assisting judges" of that court were authorized to issue the writ upon the "suggestion" that "any other court held within this Colony do exceed their jurisdiction"; 8 Col. Rec. 360; but in the Revision of 1821, p. 314, the language of the act was changed to authorize the issuance of the writ by the Superior Court where "any inferior court or tribunal do exceed their jurisdiction," language still retained in substance in our statutes. General Statutes, § 5917. Of the commission which

prepared that revision, two of the three members, Zephaniah Swift and Thomas Day, were among the most learned of our legal scholars, and the interpretation they thus placed upon the meaning of the words "inferiour courts" as including all trial courts other than the Superior is highly significant; and this is the sense in which the words are used in *State* v. *Carroll,* 97 Conn. 598, 601, 117 Atl. 694. That the legislature has intended that this be so appears from the statutory provision that all actions for equitable relief against causes pending or judgments rendered in the Superior Court shall be brought to that court exclusively, a provision which is retained in the act of 1941 we are considering. General Statutes, § 5441; Sup. 1941, § 813f; see *Cronan* v. *Mersick,* 80 Conn. 593, 595, 69 Atl. 938.

Since the adoption of the constitution, we have never been called upon to define the words "inferiour courts." We have, however, used them in such a way as to indicate that we were regarding as the determining element in the constitution of such courts the fact that they exercised only a limited jurisdiction. Thus they have had the meaning given to them by *Marshall, C. J.,* in *Kempe's Lessee* v. *Kennedy,* supra, in cases where we have distinguished between courts of general jurisdiction whose judgments cannot be collaterally attacked unless a want of jurisdiction is apparent on the record and judgments of courts of limited jurisdiction which may be so attacked. *Wattles* v. *Hyde,* 9 Conn. 10, 13; *Culver's Appeal,* 48 Conn. 165, 173; *Wheeler* v. *New York, N. H. & H. R. Co.,* 70 Conn. 326, 328, 39 Atl. 443; and see *Alcorn* v. *Fellows,* supra. In one case, without defining the distinguishing element, we have referred to the Courts of Common Pleas as "inferior" to the Superior Court as regards a writ of mandamus by the latter to a judge of the former; *Ansonia* v. *Studley,* 67 Conn. 170, 177, 34 Atl. 1030; and we have

described a city court as an inferior court. *State ex rel. Eberle* v. *Clark,* 87 Conn. 537, 555, 89 Atl. 172. So far as our decisions go, we have never made the test of an "inferiour court" dependent upon the question whether its judgments are subject to appeal. As stated in *State* v. *Fillebrown,* supra, if that was so, the Superior Court would also be an inferior court because its judgments are reviewable by the Supreme Court of Errors, and this does not accord with the natural meaning of the provision that there shall be a Superior Court and also such "inferiour courts" as the legislature may establish. Indeed, had this been the intent, the words used would naturally have been, not "such inferior courts," but "such other inferiour courts." See *Hodge* v. *State,* 135 Tenn. 525, 528, 188 S. W. 203. The connotation in which the words have been used suggests that the test is whether or not the court exercises a limited jurisdiction as distinguished from the Superior Court, which has general jurisdiction, civil or criminal, in all cases not placed by our statutes within the jurisdiction of some other court. *Styles* v. *Tyler,* 64 Conn. 432, 450, 30 Atl. 165; *State ex rel. Morris* v. *Bulkeley,* 61 Conn. 287, 374, 23 Atl. 186; *Ansonia* v. *Studley,* supra; *Cocking* v. *Greenslit,* 71 Conn. 650, 651, 42 Atl. 1000; *State* v. *Carroll,* supra, 600.

Farther than that it is not necessary to go. Under our constitution the General Assembly is vested with full authority to order the affairs of the state except as it is limited by provisions in the constitution of the United States or those of our own constitution. *State* v. *Conlon,* 65 Conn. 478, 488, 33 Atl. 519; *Beach* v. *Bradstreet,* 85 Conn. 344, 348, 82 Atl. 1030. Of the statute before us what we said in *State ex rel. Brush* v. *Sixth Taxing District,* 104 Conn. 192, 205, 132 Atl. 561, is particularly true: "A judicial holding that a legisla-

tive Act is unconstitutional is one of very grave concern. We ought not, and will not, declare a statute to be unconstitutional unless our judgment is formed in the light of this rule of our law: 'It is our duty to approach the question with caution, examine it with infinite care, make every presumption and intendment in its favor, and sustain the Act unless its invalidity is, in our judgment, beyond reasonable doubt.' *Beach* v. *Bradstreet*, 85 Conn. 344, 349, 82 Atl. 1030." We cannot hold that the legislature could not reasonably regard the Court of Common Pleas established by the act of 1941 as properly within the meaning of the words "inferiour courts" as they are used in the section of the constitution in question.

The question then arises, could the General Assembly constitutionally vest in the Court of Common Pleas the jurisdiction given to it by the act of 1941? The concluding clause in the section of the constitution under consideration reads as follows: "the powers and jurisdiction of which courts shall be defined by law." In the draft of the section reported to the convention this clause was written as a separate sentence, a period dividing it from the preceding portion; Journal, p. 89; but in the final draft the period was replaced by a colon. In either event it seems hardly admissible to construe the words "which courts" as applying merely to "inferiour courts." We do not read the majority opinion in *Styles* v. *Tyler*, supra, 452, as holding to the contrary. It states: "Assuming that these words apply to the Supreme Court of Errors, and that their effect cannot be exhausted in determining the jurisdiction apportioned between the various inferior courts and between the Superior Court and the inferior courts, it is quite doubtful if the words contain or imply the grant of any power; such grant is certainly unnecessary, for the power expressly given the legislature to

ordain and establish courts inferior to the Superior Court involves, beyond all doubt, the power to apportion the jurisdiction vested in the Superior Court between that court and courts inferior to it, as well as between such inferior courts; and the general power of legislation in respect to procedure and the whole body of the law involves the power, subject to the restrictions of the Constitution, to define limits for the exercise of the jurisdiction vested in all courts; so that it may well be that these words, as their form indicates, are simply a direction that the law shall at all times clearly define the limits of the powers and jurisdiction exercised by all courts; by those courts upon which jurisdiction may be conferred by the legislature in accordance with the jurisdiction so conferred, and by those courts whose jurisdiction is derived directly from the Constitution in accordance with the jurisdiction so granted." *Baldwin, J.,* in his dissenting opinion in this case, said. (p. 469): "If the ordinary rules of grammar are to be respected, the last clause in § 1 of article V. both as originally punctuated, and as finally engrossed and adopted, qualifies each member of the preceding clause"; and he in effect repeated that statement in his dissenting opinion in *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 609, 37 Atl. 1080, 38 Atl. 708, and in *Enfield* v. *Ellington,* 67 Conn. 459, 465, 34 Atl. 818, in which case, while he wrote the opinion of the court, a majority of the judges disagreed with him upon the point he was discussing when he made the statement.

However that may be, the significant thing about the quotation we have made from the majority opinion in the *Styles* case is its recognition of the self-evident fact that even without the words the power in the legislature to establish inferior courts necessarily involves the apportionment of jurisdiction between them

and the Superior Court, for, as the jurisdiction of the latter is unlimited, any vesting of jurisdiction in any inferior court must necessarily take something from the jurisdiction the Superior Court would otherwise have had. *Houston* v. *Royston,* supra, 549; *State* v. *Sullivan,* 95 Fla. 191, 204, 116 So. 255. It is true that it has been held in New York that "the jurisdiction of the Supreme Court is general, unlimited and unqualified and the Legislature has no power to limit or qualify it." *Decker* v. *Canzoneri,* 256 App. Div. 68, 71, 9 N. Y. S. (2d) 210, and see *People ex rel. Swift* v. *Luce,* 204 N. Y. 478, 487, 97 N. E. 850. Under the constitution of that state in effect when these cases were decided, the Supreme Court was expressly given "general jurisdiction in law and equity"; when the *Swift* case was decided, the constitution then in effect gave the legislature very little scope in defining the jurisdiction of other courts, except the surrogate's court; but when the *Decker* case came before the court, the power of the legislature in this regard had been somewhat extended; and the broad statement quoted is subject to the limitation that the jurisdiction of the Supreme Court may be affected by an increase in the jurisdiction of other courts so authorized. Nor is it without significance to our present inquiry that the legislature in that state may now enlarge the jurisdiction of county courts provided it shall not authorize an action therein for the recovery of money only in which the sum demanded exceeds $3000, and it may confer on "inferior local courts" a like jurisdiction of actions at law.

The fact that the act of 1941 gave to the Court of Common Pleas exclusive jurisdiction of certain cases, appealable only to this court, does not make the law invalid. When the constitution was adopted, it is true, as we have noted, that appeals might be taken in most

cases from the judgments of county courts and city courts to the Superior Court, and this continued to be so as regards county courts until they were abolished in 1855. Statutes, 1854, pp. 71, 74, 269; Public Acts, 1855, Chap. 26, § 17. When, however, in the years 1869 and 1870, Common Pleas Courts were established in the four counties of Hartford, New Haven, Fairfield and New London, those courts were given exclusive jurisdiction of civil causes at law wherein the matter in demand exceeded the jurisdiction of a justice of the peace and did not exceed $500, of causes in equity wherein the matter in demand did not exceed that sum, and of appeals from justices of the peace; Public Acts, 1869, Chap. 93; 1870, Chaps. 22, 87; and when in 1872 a district court for certain towns in Litchfield County was established it was given a similar exclusive jurisdiction. Public Acts, 1872, Chap. 89. When the act of 1941 became effective, all the Courts of Common Pleas possessed exclusive jurisdiction in civil matters to this extent. The fact that for some seventy-five years the grant of this exclusive jurisdiction to these courts has not been questioned goes far to substantiate the fact that the legislature may, under the constitution, vest exclusive jurisdiction over certain cases in courts inferior to the Superior Court. *State* v. *McCook*, 109 Conn. 621, 649, 147 Atl. 126; *Water Commissioners* v. *Curtis*, 87 Conn. 506, 511, 89 Atl. 189. In *Houghton* v. *Havens*, 6 Conn. 305, decided in 1826, we held that the statute then in effect (Rev. 1821, p. 407) which permitted a recovery for a secret assault gave the county courts exclusive jurisdiction of this type of action. In *Rogers* v. *Carroll*, 48 Conn. 300, decided in 1880, we held that a judgment of the city court of Norwich was not reviewable on writ of error to the Superior Court; and in *State* v. *Carroll*, supra, we recognized that exclusive jurisdiction over criminal

cases might be reposed in any "inferior court." The exclusive jurisdiction of Courts of Common Pleas was emphatically indorsed when, in *Ehrlichman* v. *Ackley*, 111 Conn. 666, 667, 151 Atl. 189, of a case brought to the Superior Court, where the judgment was for $300, we said: "The practice of bringing cases to the Superior Court which manifestly should have been brought to the Court of Common Pleas must cease." In this connection, also, our repeated statements that the Superior Court "has jurisdiction of all matters expressly committed to it and of all others cognizable by any law court of which the exclusive jurisdiction is not given to some other court" is not without significance. *State ex rel. Morris* v. *Bulkeley,* supra, 374; *Cocking* v. *Greenslit,* supra. As regards the effect in curtailing the jurisdiction of the Superior Court, there is no material distinction between a grant of exclusive jurisdiction to another court and a grant to it of jurisdiction concurrent with the Superior Court. *Conger* v. *Convery,* 52 N. J. L. 417, 443, 20 Atl. 166.

With respect to appeals from municipal boards, officers and commissioners and from the liquor control commission, exclusive jurisdiction of which is vested in the Court of Common Pleas under the act of 1941, it is to be noted that no such procedure as appeal from boards of this nature was in existence in 1818 and jurisdiction over them was no part of that possessed by the Superior Court at that time; they are solely creatures of statute; and it was intrinsic in the act of providing for appeals of this nature that the General Assembly should designate the court to which they should be taken. It might, for instance, have provided that they would lie only to a judge of the Superior Court, who would then sit as a "special tribunal" for the purpose of disposing of them. *Clapp* v. *Hartford,* 35 Conn. 66, 73; *Norwalk Street Ry. Co.'s Appeal,*

supra, 602; *Montville Street Ry. Co.* v. *New London N. R. Co.,* 68 Conn. 418, 423, 36 Atl. 811; *Woodmont Asso.* v. *Milford,* supra, 523; *Brown* v. *Cray,* 88 Conn. 141, 146, 89 Atl. 1123; and see *In the Matter of Gilhuly's Petition,* 124 Conn. 271, 276, 199 Atl. 436. We can conceive of no reason why the General Assembly might not validly vest exclusive jurisdiction of such appeals in the Court of Common Pleas.

While the constitution provided that the judges of all courts should be appointed by the General Assembly "in such manner as shall by law be prescribed," it made a sharp distinction between the terms of office of judges of the Supreme Court of Errors and the Superior Court and those of judges of the inferior courts; the former judges were to hold office during good behavior, while the latter were to be appointed annually. Const. Conn. Art. V § 3. By reason of subsequent amendments, this distinction between judges of the Supreme Court of Errors and the Superior Court, on the one hand, and judges of the Court of Common Pleas, on the other, has largely disappeared; as the constitution stands today, judges of all three courts can be appointed by the General Assembly only upon nomination of the governor, and the only difference is that the former are appointed for terms of eight years while the latter are appointed for terms of four years. Const. Conn. Am. XII, XX, XXVI, XLI. In so far as any significance as indicating the meaning of the words "inferiour courts" can be attributed to the distinction made in the original provisions of the constitution, the people of the state by the amendments they have adopted have substantially done away with it. Nor does the fact that the Court of Common Pleas is made one court for the entire state require us to hold the act unconstitutional. It is true that we have never previously had any court other than the Superior Court

which was other than a local court. In determining whether a court is an inferior court, the fact that it sits throughout the state as one court might be a factor to be considered. See *People ex rel. Sokoll* v. *Municipal Court,* supra. But if the General Assembly had established a Court of Common Pleas which would be one court for the entire state, limiting its jurisdiction to a small sum or providing that appeals from its judgments might be taken to the Superior Court, there can be no question .that it would have been an inferior court. We cannot hold that the provision establishing a Court of Common Pleas as one court for the entire state is in this instance of controlling significance. The statement in *People ex rel. Swift* v. *Luce,* supra, 486, that "the legislature was without power to create a new court with statewide jurisdiction" has little weight as an authority here because, under the constitution of New York existing when it was decided, the legislature was not authorized to establish "inferior courts" but only "inferior local courts." Constitution of New York, 1894, Art. VI, § 18.

The power of the General Assembly to create "inferiour courts" is not, however, unlimited. As we have said, the constitution adopted the Superior Court as an existing court with the essential characteristics it had previously possessed. *Styles* v. *Tyler,* supra, 450; *Dexter Yarn Co.* v. *American Fabrics Co.,* 102 Conn. 529, 538, 129 Atl. 527. Not only must any other court the General Assembly creates be an "inferiour court" but it may not be so constituted as materially to detract from the essential characteristics of the Superior Court as it was then constituted. That was the basis of the decision in *Styles* v. *Tyler,* supra. The question there discussed was as to the effect and validity of a provision in § 9 of Chapter 174 of the Public Acts of 1893, that "The supreme court shall review all ques-

tions of fact raised by the appeal as well as all questions of law." We held that the words "Supreme Court of Errors" as used in the constitution had at the time it was adopted a definite connotation in the minds of the people of the state; they described a court having certain essential characteristics, one of which was that it was confined to reviewing questions of law; and we held that the General Assembly might not by statute alter that essential quality by requiring that the court determine on appeal pure questions of fact. On the other hand, we have said of the Superior Court, when it is acting on appeals from probate which clearly present questions within the scope of judicial inquiry, that "It is not exercising the judicial powers vested in it by the Constitution but is exercising a special and limited jurisdiction conferred upon it by the statutes." *Palmer* v. *Reeves,* 120 Conn. 405, 409, 182 Atl. 138.

If the General Assembly may not add to the jurisdiction of this court or to the Superior Court functions which essentially alter its character, it is equally without power to do this by taking jurisdiction from these courts, either directly or by giving it to other courts. See *Ferris* v. *Higley,* 20 Wall. (87 U. S.) 375, 384, 22 Law Ed. 383. It could not, for example, create a court which would have in all respects concurrent jurisdiction with the Superior Court; *Rhyne* v. *Lipscombe,* 122 N. C. 650, 657, 29 S. E. 57; *Tate* v. *Commissioners,* 122 N. C. 661, 663, 29 S. E. 60; nor could it establish a court which should have that jurisdiction in a particular locality. See *State ex rel. Rogers* v. *Judge of County Court,* 11 Wis. 50, 54. It could not take from the Superior Court the right to exercise a function necessary to the performance of its essential jurisdiction; *Mott* v. *Commissioners,* 126 N. C. 866, 36 S. E. 330; and it is highly questionable whether it could deprive the Superior Court of the power to issue such

prerogative writs as are necessary to prevent other courts in the state from transcending the bounds of their jurisdiction and powers. *Flanagan* v. *Plainfield,* 44 N. J. L. 118, 122. "The peculiar quality of a constitutional court, or of any other constitutional establishment, is this, that it is not susceptible of change in its fundamental principles, except in some prescribed mode. Thus, for example, the nature of this court, or the nature of the Supreme Court, cannot be altered in any way but one, that is, by a modification of the Constitution itself. It is presumed that no professional gentleman would, for an instant, contend that the legislature could deprive the decrees and judgments of this court of their quality of being conclusive, or could take from the Supreme Court any of those prerogative writs by which inferior jurisdictions are superintended and regulated. The power to do this would involve the power to modify in essential particulars the constitution of these courts; a power not to be distinguished from an authority to supersede or abolish. It is entirely clear then that the legislature has not the competency to impair the essential nature or jurisdiction of any of the constitutional courts." *Harris* v. *Vanderveer's Executor,* 21 N. J. Eq. 424, 427. Indeed the extension of the exclusive jurisdiction of the Court of Common Pleas might in itself be so great that it would practically impair the constitutional status of the Superior Court. With these qualifications it is true that "There is nowhere in that instrument [the constitution] any limitation in respect to the number or character of the inferior courts which they [the General Assembly] may establish." *Brown* v. *O'Connell,* 36 Conn. 432, 447.

While we have discussed separately the various objections which have been made to the constitutionality of the act of 1941, we are not to be understood as hav-

ing overlooked the cumulative effect of its various provisions. On the other hand, because certain of the purposes which lay back of the act came within the direct cognizance of the courts, we are well aware of them. There were very real and obvious reasons why the ends of justice would be better served if judges of the Courts of Common Pleas should not sit continuously in one county but should go on circuit; this would make it possible also to relieve congestion of the docket in any particular county by providing additional sessions of the court there; and, to accomplish these purposes, the legislature might consider it a reasonable expedient to establish a single Court of Common Pleas throughout the state. The grant of unlimited concurrent jurisdiction over foreclosures in the act of 1941 is a continuation of a similar grant made to the former Courts of Common Pleas at a time when, due to economic stress, the Superior Court was confronted with great difficulty in hearing the many actions of that nature brought to it, almost all uncontested, and business institutions were clamoring for a speedier method of disposing of them. In other respects the dockets of the Superior Court had become overcrowded, with consequent long delays in the disposition of cases; and while theoretically this situation might have been met by providing more judges of the Superior Court there were not, in the larger counties at least, available facilities for substantially increasing the number of sessions of that court. This situation had become one of concern not only to lawyers and to laymen, who could not understand why their cases were not tried, but to the judges of the Superior Court themselves. The extent to which exclusive jurisdiction should be given to the Court of Common Pleas by that act in order to relieve this situation could, when it was adopted, be but estimated,

but it is not without significance that it appears from statistics in the possession of the judicial department of the state that during the year ending June 30, 1942, the number of cases entered in the Superior Court was only two hundred and forty-four less than it was during the preceding year, while the number of cases entered in the Court of Common Pleas was about one thousand more than were entered in the previous year in all the then existing Courts of Common Pleas. It is true that the statistics as to cases returned to the Superior Court and Court of Common Pleas in the four counties having a relatively small population afford little, if any, justification for the extension of the latter court to these counties; but as the legislature certainly had power to establish Courts of Common Pleas in these counties this fact has little significance as regards the question of the validity of the act of 1941 as a whole. It must be recognized, however, that in the broad grant of jurisdiction to the Court of Common Pleas, summing up as it does the various extensions of jurisdiction which through the years have been made as regards the former Courts of Common Pleas, the General Assembly has trenched far upon the jurisdiction of the Superior Court as it existed when the constitution of 1818 became effective, and the question whether the act can be sustained is a very close one. Not without considerable hesitance have we concluded that by the terms of the act the status of the Superior Court as the trial court of general jurisdiction throughout the state and its essential characteristics have not been so impaired as to make the act unconstitutional.

The rule to show cause is dismissed.

In this opinion JENNINGS, ELLS and DICKENSON, Js., concurred.

Brown, J. (dissenting). With the majority's view that the test determinative of the constitutionality of the 1941 act is one of degree, I am in accord. With the conclusion that in applying this test the legislature did not transcend the limit upon the authority fixed by the constitution, I disagree.

As is pointed out in the opinion, when the constitution was adopted in 1818 the "Superiour Court" was already in existence, and had been for more than one hundred years, as the trial court of general jurisdiction, and "there can be no doubt that it was the intent of the constitution that this court should continue, with the essential characteristics it had previously possessed." A comparison of the jurisdiction of the "courts of common pleas or county courts" and city courts, the only other trial courts of that day, which was limited to $335 in civil actions and subject to appeal to the Superior Court, with the state-wide jurisdiction conferred upon the Court of Common Pleas by the 1941 act is an aid to visualizing the extent to which encroachment by legislative enactment upon the jurisdiction which was the Superior Court's when the constitution was adopted has gone. The jurisdiction so bestowed upon this Common Pleas Court as it materially affects the Superior Court is exclusive as to both legal and equitable actions wherein the matter in demand does not exceed $2500; appeals from municipal boards, officers and commissions; and appeals from the liquor control commission. It is concurrent with that of the Superior Court as to actions for the foreclosure of mortgages or liens wherein the matter in demand exceeds $2500. The encroachment referred to is no less by virtue of the fact that some or all of the appeals mentioned are the creatures of statute, for, in the absence of provision so made, rights violated by a proceeding affording the basis of any such appeal

would be the subject of redress in the Superior Court as the court of general jurisdiction.

The metamorphosis in the jurisdiction of the Superior Court manifest from the foregoing is the ultimate cumulative result of a long succession of legislative enactments from 1818 to 1941. It would be neither feasible nor worth-while to detail them in this dissent for they are legion. Nor would it profit to consider whether the enactment of any given statute prior to the 1941 act violated the constitutional provision now in question. I do, however, refer to three isolated instances, of the many which could be cited, to illustrate the gradual process of attrition employed by the legislature which has whittled away the Superior Court's jurisdiction. When the Common Pleas Courts were established in 1869 and 1870 in the four counties of Hartford, New Haven, Fairfield and New London, the limit in law and equity of their exclusive civil jurisdiction was fixed at $500, and of their jurisdiction concurrent with the Superior Court, at $1000. In 1917 the limit of concurrent jurisdiction of the Common Pleas Courts of Fairfield and Litchfield was increased to $2000. Public Acts, 1917, Chap. 315. In 1921 the same change was made in the jurisdiction of the other Courts of Common Pleas. Public Acts, 1921, Chap. 201, § 2. In 1935 this concurrent jurisdiction was further increased to include actions of foreclosure without limit as to maximum amount. General Statutes, Cum. Sup. 1935, § 1645c. In 1937 this provision was re-enacted in more emphatic language, declaring that such action may be brought in either court "regardless of how much it [the matter in demand] may exceed two thousand dollars," and that when "brought to the court of common pleas, such court shall have jurisdiction, fully equal to and coextensive with that

of the superior court." Sup. 1937, § 838d; Cum. Sup. 1939, § 1396e.

In 1866 the City Court of Waterbury was created with unlimited jurisdiction in "all civil cases, wherein the title to land is not concerned" and "all suits in equity" except for relief against proceedings in the Superior Court. 6 Spec. Laws 76. In 1868 jurisdiction in foreclosure of premises located within the limits of its jurisdiction was granted and provision made that "the jurisdiction of the superior court within said limits shall be concurrent with that of said city court." 6 Spec. Laws 441. In 1881 the City Court was supplanted by the District Court of Waterbury, which succeeded to all its jurisdiction and powers. Public Acts, 1881, Chap. 121. In 1927 the Court of Common Pleas in the judicial district of Waterbury in like manner became the successor of the District Court. Public Acts, 1927, Chap. 181. This court had unlimited concurrent jurisdiction with the Superior Court in the respects set forth in § 5440 of the General Statutes.

In 1927 a Criminal Court of Common Pleas was established in Litchfield County. Public Acts, 1927, Chap. 92. Section 2 provides that it "shall also have concurrent jurisdiction with the superior court of all offenses committed within said county in violation of the provisions of the general statutes relating to motor vehicles, or of the provisions of section 6191 of the general statutes." Section 6191 of the 1918 Revision so referred to is now Cum. Sup. 1935, § 1686c, and provides a maximum penalty of a $1000 fine and imprisonment for ten years for misconduct of railroad servants or motor vehicle operators resulting in death. It has been argued that the significance of legislation of the nature of those acts to which I have been referring lies not in their cumulative effect evidencing a violation of the constitution but rather in the contrary indica-

tion implicit in the legislature's practical construction placed upon the constitution by their enactment. The answer to this contention is that two wrongs do not make a right, and the legislature cannot lift itself by its own bootstraps on the theory that they do.

From what has already been stated it is evident that the legislature had gone far in increasing the jurisdiction of the several Courts of Common Pleas and subtracting from that of the Superior Court prior to the 1941 act. Among other changes, the Superior Court's jurisdiction of appeals from Courts of Common Pleas was early taken away; cases of all kinds involving an increasingly large amount in issue, finally reaching $2000, had been eliminated; unlimited concurrent jurisdiction in foreclosures had been given to the Courts of Common Pleas and the same was true of the other actions in law and equity in the Court of Common Pleas in the judicial district of Waterbury; and criminal concurrent jurisdiction to impose a maximum penalty of ten years in state's prison had been granted the Criminal Court of Common Pleas in Litchfield County. The 1941 act carried this process of encroachment still further. It raised the Common Pleas' exclusive jurisdiction to $2500 and extended it to include appeals from the liquor control commission as well as those from municipal boards, officers and commissions. In view of the very large values often involved in zoning and tax appeals, this change in jurisdiction is of particular importance, and because of the great number of cases of substantial merit falling within it the $2500 provision also wrought a very vital change in the nature of the two courts. Beyond all this, the act vitally changed the very structure of what had theretofore been the several Courts of Common Pleas, each authorized to function only in its own county or district through its resident judges, by creating in their

stead a single Court of Common Pleas of state-wide jurisdiction with fourteen judges on circuit. In short, as Judge Cornell so aptly stated, it brought into being "a replica of the Superior Court." Even though the legislature felt that the state of business in the courts required that additional facilities be provided, this, in my opinion, would afford no justification under the constitution for the passage of the 1941 act. In this connection, however, it is interesting to observe that during the entire court year following the adoption of this act increasing the former number of eight judges, one associate and one deputy judge to fourteen judges, and providing sessions for Middlesex, Tolland and Windham Counties where there had been no Common Pleas Courts before, the total aggregate number of civil cases tried in these three counties was fourteen, and the total number of civil cases tried by the Court in the whole state was six hundred and seventy-two, which was identical with the average number of cases annually tried by the Courts of Common Pleas as they had existed during the ten-year period immediately prior to the adoption of the act.

To sum up, between 1818 and 1941 the legislature by degrees, but none the less progressively and effectively, had been gradually depriving the Superior Court of jurisdiction. Then came the culminating act of 1941 unifying the cumulative encroachment of the past years and establishing another court of state-wide jurisdiction which duplicated the Superior Court. It had laden the proverbial camel's back with many straws already. Finally, by its adoption of this act it added a whole bundle to top all the rest. It is my conclusion that this act violates the constitution, and that under it the Superior Court cannot "continue, with the essential characteristics it had previously possessed." For this reason I have a deep and abiding

conviction that now, once and for all, is the time to call a halt before it is too late. By this course only, in my judgment, can the continuance of the Superior Court with those characteristics which belonged to it at the adoption of the constitution be assured, and also the right of the individual to bring his action in a proper case to that court, which the constitution expressly and so wisely guarantees, be preserved. To uphold the 1941 act will serve to reduce well toward the vanishing point the distinction between the Superior and Common Pleas Courts. By the act's express provision the former has already been rendered "inferior," at least as to those appeals of which exclusive jurisdiction is given to the Court of Common Pleas. Transfer by the legislature of such jurisdiction of but a few more causes of action such as motor vehicle cases, compensation and probate appeals, and divorces, which would be hardly more unreasonable than the changes wrought by the 1941 act, will be all that is needed to complete the demotion of the Superior to an "inferior" court with the consequent exaltation of the Court of Common Pleas. No stretch of the imagination is required to foresee that further legislation of this nature may well so decrease the business of the Superior Court as to warrant a substantial reduction in the number of its sessions and judges by the legislature. When that time comes this court will be powerless to prevent it. Instead, we shall be restricted to passive acquiescence as we observe the Superior Court supplanted by this new statutory court of general state-wide jurisdiction, relegating the Superior Court as heretofore known to a memory.

I conclude that Judge Cornell's decision that the 1941 act was unconstitutional is correct.