STATE EX REL. CHARLES E. WILLIAMSON
*vs.*
CHARLES B. PEARE ET AL., REGISTRARS

Superior Court        Fairfield County        File No. 67459

MEMORANDUM FILED FEBRUARY 24, 1944.

*Frank L. Wilder,* of Bridgeport, for the Relator.

*Cummings & Lockwood,* of Stamford, for the Respondents.

O'SULLVAN, J.   During the course of its last regular session, the General Assembly voted to restore to Charles E. Williamson of Darien the right of franchise which he had previously forfeited when convicted of the crime of conspiracy. The vote was on the passage of the following:

"State of Connecticut,

"General Assembly,

"January Session,

"A.D. 1943

"An Act Restoring Forfeited Rights to Charles E. William-son.

"Be it enacted by the Senate and House of Representatives in General Assembly convened:

"All rights forfeited by Charles E. Williamson of Darien by reason of conviction of crime are restored."

Upon the passage of the foregoing by a two-thirds vote of each House, it was presented to the Governor who returned it, without his signature and with his objections, to the House of Representatives where it had originated. On the succeeding day, that body recommitted it to the committee on forfeited rights, in whose possession it still remained when the Assembly adjourned *sine die*.

On September 7, 1943, Williamson requested the defendant registrars of voters of Darien to place his name on the voting list. They refused to do so on the ground that the Governor had failed to give his approval to the Assembly's action. Thereupon, Williamson launched the present litigation through which he seeks the issuance of a peremptory writ of mandamus to compel the defendants to comply with his request.

His theory is this: the act of restoring forfeited rights to a disenfranchised citizen is an exclusive function of the General Assembly, subject to neither the approval nor the disapproval of the Governor. With this as his premise, he maintains that after both Houses had voted affirmatively on the matter, he became reenfranchised, a status which the subsequent veto of the Governor could not destroy.

A traditional method, recognized in law, by which the Assembly may legally express itself within a limited field of legislative activity is the joint resolution, recognizable by the formula with which it begins, namely, "Resolved by this Assembly" or phrases of similar tenor. *Water Commissioners vs. Curtis*, 87 Conn. 506. Another legislative instrument is the bill, which must always be utilized in enacting a law, because of the constitutional requirement that "the style of their laws (i.e., those of the General Assembly, shall be, BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES IN GENERAL ASSEMBLY CONVENED." Connecticut Const., Article Third, §1.

The word "laws" has no fixed meaning. It may be used broadly to include all written expressions of governmental will. Then again, it is frequently employed in a narrow sense "to designate those legislative enactments which undertake to prescribe the rights and duties generally of those who are subjects of the sovereign power, and to regulate their conduct." *Water Commissioners vs. Curtis, supra,* p. 509. It is within this latter meaning that the word, as used in Article Third, falls. In as much as the restoration of forfeited rights is not a law within the constitutional meaning, and as the Assembly has the power, by virtue of the Seventeenth Amendment to the Connecticut Constitution to reenfranchise, it may proceed to do so by joint resolution. *Water Commissioners vs. Curtis, supra,* p. 509.

The Fortieth Amendment requires that "each bill which shall have passed both houses of the general assembly shall be presented to the governor" for his approval or disapproval. The Constitution is silent as' to similar procedure for joint resolutions.

This silence is highly significant. The distinction between a bill and a resolution must have been thoroughly understood and appreciated in 1818 by those interested in government and parliamentary law. It would be a grave reflection upon the mental caliber of such eminent constitutional delegates as Oliver Wolcott, Zephaniah Swift, Thomas Williams and Ralph Ingersoll to think otherwise, especially in view of the long-continued use of both forms of legislative instrument by the General Court during the preceding decades.

Again, the Federal Constitution and that of the State of Mississippi were utilized by the delegates as sources of suggestion for the drafting of the proposed Connecticut organic law and each of these two Constitutions expressly required the submission to the chief executive of both bills and resolutions. Take, for example, the wording of the second paragraph of section 7 of Article One of the Federal instrument. That paragraph is incorporated into our Constitution, almost word for word, to become section 12 of Article Fourth. This is the provision which reads that "every bill which shall have passed both [houses] of the General Assembly, shall be presented to the Governour."

The significance of this reference does not lie in what was

lifted from the Federal Constitution but rather in what was not purloined. For, directly after the provision requiring presidential approval of bills, the Federal instrument proceeds to state that "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States" and shall be approved by him before "the Same shall take Effect."

This method of appropriating the Federal provision as to bills and of ignoring a similar one as to resolutions speaks eloquently of the purpose of the drafters that bills, and bills alone, should be submitted to the Governor.

If, then, the distinction between bills and joint resolutions is constitutionally recognized, why was it, as the inevitable query will suggest, that from the time of the first Assembly following the adoption of the Constitution, the practice developed of submitting joint resolutions, almost without exception, to the Governor? I am at the mercy of speculation as to the correct answer to this intriguing question and nothing of a decisive nature has been unearthed by a diligent research among musty archives, old newspapers, annals and chronicles to shed illumination upon the matter. But though completely in the dark as to why the practice began and grew, I entertain no uncertainty as to the lack of constitutional justification for it. Nor am I lacking good company in taking this position. In 1861, Judge Ellsworth, hearing 'an observation made during the course of an argument before the Supreme Court that Governor Buckingham had lately taken upon himself to veto certain joint resolutions remarked, "I know it, but the question has not been settled whether his veto amounts to anything." *John Hooker, Reminiscences,* 131. Since then, this remark has twice been referred to in appellate opinion, the last being in 1913. *McGovern vs. Mitchell,* 78 Conn. 536, 558; *Water Commissioners vs. Curtis, supra,* p. 515.

But happily, I am not required to solve this riddle, for my problem is far more limited in that it is concerned with the specific facts upon which the instant case is built. Had the Assembly, in attempting to restore Williamson's right of franchise, made use of a joint resolution, I would of necessity be obliged to answer the broad question which I purposely avoid meeting. But no resolution was in fact acted upon. The instrument was neither one thing nor the other, neither entirely

a bill nor entirely a resolution. Its style was of the former, its substance of the latter. It was not a bill because it did not incorporate a proposed law. It was not a resolution, because of its form.

Such a hybrid has no warrant in our legislative proceedings, even though by custom since 1911, it has been constantly employed. To return to the proper track, the Assembly of 1943 provided that henceforth "any application....for the restoration of the privileges of an elector shall be presented in the form of a resolution." Supp. (1943) §1g.

Let us assume, however, that in spite of its form, it was in fact a resolution. There is another difficulty in the way. It appears that after the "resolution" was returned to the House of Representatives by the Governor, that body recommitted it to the committee on forfeited rights and the Assembly adjourned *sine die* with the "resolution" still in the hands of the committee. In this state of affairs it was buried forever. It died as effectively as though it had never passed because it failed to return to such proper channels as would permit its reaching its proper place in the office of the Secretary of State.

This irregularity makes impossible, it seems to me, any meritorious assertion that rights were restored to Williamson by a so-called "resolution" which, so far as the journal of the House of Representatives reveals, may this very minute be in the coat pocket of the chairman of the committee on forfeited rights. It was obviously the intention of the House, laboring, as apparently it was, under the impression that Williamson's rights could be restored only through the medium of a bill, to retain control of the instrument upon which it had acted and by its subsequent procedure of recommitment to destroy whatever validity there may have been to its original vote. *State vs. Savings Bank of New London,* 79 Conn. 141.

I hold, therefore, that the right of franchise was not restored to Williamson, first, because of the unwarranted type of legislative instrument utilized by the Assembly and secondly, because of the recommitment of the instrument with the legislative intent, by so doing, to deny his petition for reenfranchisement. Hence, a writ of mandamus is denied.